[No. 36338. Department Two. March 28, 1963.]

DORIS THOMPSON, *Individually and as Administratrix, Respondent*, v. BOBBY RAY EZZELL *et al., Defendants,* JOHN HENRY AUGUSTIN RISELEY PRICHARD *et al., Appellants.**

*Reported in 379 P. (2d) 983.

*Evans, McLaren, Lane, Powell & Moss, Martin P. Detels, Jr.,* and *Barry H. Biggs,* for appellants.

*LeSourd & Patten, F. A. LeSourd, Woolvin Patten,* and *Max D. Crittenden,* for respondents.

FINLEY, J. — The respondents recovered a judgment against Bobby Ray Ezzell and his wife, Donna Ezzell, in a negligence action arising out of a fatal aircraft accident in which Bobby Ezzell was the pilot and the respondents and their decedents were passengers. Subsequently, the respondents served a writ of garnishment on the appellant Prichard,[1] contending that the appellant was indebted to the Ezzells, thus raising the question of whether an aviation liability policy which had been issued to Cruisers, Inc., insured the liability imposed upon the Ezzells by the judgment in the negligence action. The instant appeal is predicated upon a summary judgment rendered in that garnishment action.

On July 3, 1959, a Piper aircraft, owned by Cruisers, Inc. (a nonprofit Washington corporation, of which the pilot Ezzell was a member), crashed while taking off from an airport in Cheyenne, Wyoming. The occupants of the plane were Mr. and Mrs. Ezzell, Mr. and Mrs. Thompson and their two minor children. Both families were en route to the Midwest from Renton, Washington, for vacations — the Thompsons headed for Wichita, Kansas, and the Ezzells for Oklahoma City, Oklahoma. Prior to their departure from Renton, Ezzell requested and received permission from the members of Cruisers, Inc., to use the aircraft for his trip. Also, prior to the departure, Mr. Thompson delivered $375 to Mr. Ezzell, which was to be used by Ezzell to defray all expenses that would be incurred during the course of the trip to and from Wichita.

The appellant's principal contention on appeal is that there are genuine issues of material facts; therefore, the granting of a summary judgment by the trial court constituted error. There is no question that the appellant's

[1] The writ of garnishment and initial proceeding in the garnishment action were against Underwriters at Lloyd's and that was the garnishee defendant of record at the time the summary judgment was entered. Thereafter, by stipulation of the parties and order of the trial court, a judgment theretofore entered against Underwriters at Lloyd's was vacated, and Prichard was substituted as garnishee defendant, *nunc pro tunc.*

liability, if any, is derived from the insurance policy which was issued to Cruisers, Inc. Before discussing particular provisions of the policy, it is advisable to reiterate some of the basic maxims which have been utilized by this court in interpreting contracts of insurance. In *Selective Logging Co. v. General Cas. Co. of America* (1956), 49 Wn. (2d) 347, 351, 301 P. (2d) 535, we stated:

"It is the established rule in this state that, where a provision of a policy of insurance is capable of two meanings, or is fairly susceptible of two different constructions, that meaning and construction most favorable to the insured *must be applied,* even though the insurer may have intended another meaning. . . ." (Italics ours.)

See, also: *Lesamiz v. Lawyers Title Ins. Corp.* (1958), 51 Wn. (2d) 835, 322 P. (2d) 351; *Jack v. Standard Marine Ins. Co.* (1949), 33 Wn. (2d) 265, 205 P. (2d) 351, 8 A. L. R. (2d) 1426; *Kane v. Order of United Commercial Travelers of America* (1940), 3 Wn. (2d) 355, 100 P. (2d) 1036; and *Guaranty Trust Co. v. Continental Life Ins. Co.* (1930), 159 Wash. 683, 294 Pac. 585. It is equally well established that the language of insurance policies should be interpreted in accordance with its ordinary meaning rather than in a technical sense, unless it is clear that the parties to the contract intended that the language have a technical meaning. See: *Selective Logging Co. v. General Cas. Co. of America, supra; Jack v. Standard Marine Ins. Co., supra; Zinn v. Equitable Life Ins. Co.* (1940), 6 Wn. (2d) 379, 107 P. (2d) 921; and *Kane v. Order of United Commercial Travers of America, supra.* Another maxim is that exclusionary clauses in insurance policies are to be very strictly construed against the insurer. With reference to this, in *Jack v. Standard Marine Ins. Co., supra,* we quoted with approval from *Ingalls, Inc. v. Hartford Fire Ins. Co.,* 137 Cal. App. 741, 31 P. (2d) 414, as follows:

" ' . . . in the absence of anything in the policy indicating a different meaning, the ordinary sense of the words used should not "by any nice distinction or artificial refinement" be changed in order to avoid a risk which seems

to have been fairly within the contemplation of the policy.' " (p. 273)

In light of these principles governing the interpretation of insurance contracts, it is necessary to examine the circumstances giving rise to the liability of the Ezzells in conjunction with the specific provisions of the insurance policy issued to Cruisers, Inc. The first question is whether the Ezzells were insured by the policy. The policy of insurance designated Cruisers, Inc., as the named assured and provided as follows:

"The term 'Named Assured' shall mean only the Assured specified in this Insurance but the unqualified word 'Assured' wherever used includes not only the named Assured but also any person while using or riding in the aircraft and any person or organization legally responsible for its use, provided the actual use (as hereinafter defined) is with the expressed permission of the Named Assured. . . .

"THE WORDS 'ACTUAL USE' AS USED IN THIS INSURING AGREEMENT III, SHALL BE DEFINED AS THE ACTUAL OPERATION (S) ON WHICH THE AIRCRAFT IS ENGAGED ON THE FLIGHT DURING WHICH THE ACCIDENT OCCURS."

Cruisers, Inc., is a flying club composed of persons interested in flying, who, by pooling funds, were able to purchase a plane which was then used by the members in compliance with the bylaws of the corporation. The minutes of the Cruisers meeting of June 7, 1959, state:

"Motion made seconded and approved granting Wood and Ezzell permission to use the club airplane for their respective vacations."

But appellant contends that action by Cruisers, Inc., did not constitute the express permission for actual use required by the above-quoted provision of the insurance policy. The appellant contends that (1) when Ezzell requested permission to use the plane he did not inform the members of Cruisers that he intended to take the Thompsons on the flight or that the Thompsons were contributing $375; and (2) a bylaw of Cruisers, Inc., provides, "Each and every member shall operate the corporate airplane or airplanes

in accordance with C.A.A. regulations," and Ezzell alleg-
edly violated such C.A.A. regulations.

In a recent automobile case the insurance policy
involved provided that permission for actual use was re-
quired; we stated

"The so-called omnibus clause has been before the courts
on many occasions, both before and since the addition in
such clauses of the word 'actual,' italicized above. What-
ever may have been the intent of the insurance companies,
the change has little practical significance." *Wallin v. Knudt-
son* (1955), 46 Wn. (2d) 80, 82, 278 P. (2d) 344.

There is no question that Cruisers did in fact grant Ezzell
permission to use the plane for his trip to the Midwest.
Even assuming that the members of Cruisers were not
informed that the Thompsons were accompanying the Ez-
zells on the trip, would that result in the annulment of the
permission granted to Ezzell for the use of the plane? We
stated in *Wallin, supra,* p. 84:

" . . . the results achieved in various cases depend
upon the extent to which the elements of purpose, place,
distance, and time, or a combination of them, are deemed to
be material to the permission given. . . ."

In the instant case when the members of Cruisers
granted Ezzell permission to use the plane they did so with
knowledge that he intended to fly to the Midwest for a
vacation trip at that particular time. Thus, they had knowl-
edge of the elements which were deemed material in the
granting of permission in the *Wallin* case. So the question
of whether the members of Cruisers knew that the Thomp-
sons were going to accompany the Ezzells is immaterial,
because the presence of the Thompsons in the plane is at
most a minor deviation from the permission granted to
Ezzell for the use of the plane.

A second contention made by the appellant (vis-
a-vis permission) is that alleged violations of C.A.A. regu-
lations constituted a revocation or cancellation of the
permission initially granted to Ezzell for the use of the
plane. A bylaw of Cruisers, Inc., provides that:

"Each and every member shall operate the corporate airplane or airplanes in accordance with C.A.A. regulations."

The obvious purpose of this bylaw was to inform the members of Cruisers, Inc., of the standards that would be required of them during their operations of the aircraft. This purpose is manifested by the provisions of another bylaw which empowers the board of trustees either to fine or expel members from the corporation for violations of those standards. Thus, it is apparent that the admonition not to violate C.A.A. regulations does not mean that the granting of permission is contingent upon the absence of such violations in the future, so that such a violation would automatically revoke such permission; but rather the admonition is directed to informing members of Cruisers, Inc., of the standards which are required of them by the club in their operation of the aircraft. A similar conclusion was reached in *Hartford Acc. & Indem. Co. v. Collins* (1938 5th Cir.), 96 F. (2d) 83, in which the court held that the employee's permission to use the company car was not destroyed when he violated a company rule by giving Collins, the injured plaintiff, a ride in the car.

■ The next issue raised by the appellant has reference to whether there is a material dispute of fact as to the nature of the $375 contributed by the Thompsons. In order to resolve that question it is necessary to consider the provision of the insurance policy that defines "Pleasure and Business," since the policy only applies while the aircraft is being used for "Private Business and Pleasure:"

"Pleasure and Business—personal, pleasure and family uses of the Assured and direct uses in connection with the business or occupation of the Assured *excluding any operation or flight for which a charge is made ('share expense' flights shall not be considered as being made for a charge),* dual or solo instruction (except instruction to the Named Assured) and rental to others; . . ." (Italics ours.)

By virtue of the above-quoted insurance provision there are three distinct classifications made with reference to the receipt of monetary consideration. There being no con-

tention that the circumstances in the instant case constituted a "rental," thence the issue only revolves about a differentiation between "a charge" and "share expense." It is obvious that both a *charge* and *share the expense* result in the flow of some monetary consideration to the recipient; yet one is insured under the policy of insurance, while the other is excluded. Thus, it is necessary to interpret the policy in order to ascertain the differentiation between the exclusion from coverage (flight for a charge) and the exemption from that exclusion (share expense). While undertaking to interpret the provisions of the policy, it is incumbent upon us to observe the maxims of construction hereinbefore referred to; *e.g.,* the construction most favorable to the insured must be applied. In interpreting the exclusionary clause an important consideration is the difference in the risks to be assumed by the insurer that resulted in insurance coverage for share expense flights but not those made for a charge. The only apparent difference in the risks involved by the respective types of flight is in relation to the frequency of flights. Thus, the distinction seems to be that in a flight made for a charge the charge provides the impetus or motivation for the flight; *e.g.,* profit; while a share expense flight indicates a community interest in the flight, that is, a common desire to make the particular flight.

With reference to the instant flight, Messrs. Thompson and Ezzell met and planned the trip to the Midwest for both families. During the course of their planning, it was estimated that the trip would involve approximately 45 hours of flight time, for which Cruisers, Inc., would have to be compensated at the rate of $4.50 per hour. Any cash expenditures made for gas or oil during the trip would constitute a credit toward the balance incurred by the charge of Cruisers, Inc. In view of the aforementioned and other anticipated expenses, they decided that Mr. Thompson should contribute $375, which would then be used by Mr. Ezzell to defray the expenses. Those expenses included the cost of: overnight accommodations, food, transportation

to and from the airports, tie-down and storage fees for the plane, other miscellaneous expenses incurred during the trip, and the shipping of baggage by air freight. In light of the circumstances of the flight indicating a common desire to make the flight and the extent of the contribution in relation to the expenses, the contribution must be considered as being a share-the-expense within the provisions of the insurance policy. Hence, the lump sum contribution does not constitute a disputed material fact which would have rendered a summary judgment inappropriate.

Another contention made by the appellant is that there exists a dispute as to material facts with relation to alleged violations of C.A.A. regulations by Ezzell. These alleged disputes are only material if they would result in Ezzell's being brought within the scope of the specific exclusions from coverage enumerated in the insurance policy. In considering those exclusions it is appropriate to quote in their entirety the provisions of the policy relating to exclusions from coverage:

"This Insurance Does Not Apply: —

"1. Under any and all coverages while the aircraft is being operated in flight: —

"A. In violation of the Civil Aeronautics Administration regulations pertaining to the Airworthiness Certificate or Operations Record of the insured aircraft, or to the terms of the Pilot Certificate; or

"B. In violation of Civil Air Regulations pertaining to Acrobatic, Aerobatic, Instrument or Night Flying or to Repairs, Alterations and Inspections or to Minimum Safe Altitudes; or

"C. For instructional purposes unless such purposes are approved in the Declaration; or

"D. For any unlawful purpose or any purpose other than the purposes specified in the Declaration; or

"E. Outside the Geographical Limits described in the Declaration unless due to Force Majeure; or

"F. By any person other than pilots with current and valid Pilot Certificates who are named or described in the Declaration; or

"G. Also when 'not in flight,' while being used for Crop

Dusting, Seeding or Spraying, any form of Hunting, Animal or Bird Herding or Closed Course Racing; or

"H. For any purpose or flying for which a waiver by the Civil Aeronautics Administration is required (whether granted or not) unless this Insurance is specifically endorsed to include such purpose or flying."

■ It is undisputed that the aircraft involved in the crash had a current and valid certificate of airworthiness. But there is a factual dispute as to whether the aircraft was overloaded at the time of the crash; the allegation is that it was overloaded by some 80 pounds, while the gross weight was approximately 2,000 pounds. The appellant contends that, since overloading constitutes a violation of C.A.A. regulations, there is an exclusion from insurance coverage by virtue of the provisions of exclusionary Clause 1-A, hereinbefore quoted. That clause provides that there is no insurance coverage if the aircraft is being operated in flight in violation of C.A.A. regulations pertaining to the Airworthiness Certificate. The Certificate states: "The aircraft identified hereon is considered airworthy when maintained and operated in accordance with the Civil Air Regulations and applicable aircraft Operation Limitations." The appellant, in effect, argues that a reading of exclusionary Clause 1-A and the Certificate of Airworthiness in tandem dictates the conclusion that all Civil Air Regulations are incorporated into exclusionary Clause 1-A. But such a construction would render exclusionary Clause 1-B completely superfluous, since it enumerates some specific violations of Civil Air Regulations. The existence of exclusionary Clause 1-B, therefore, indicates that Clause 1-A was not intended to incorporate all of the C.A.A. regulations as grounds for exclusion from coverage under the insurance policy. The C.A.A. regulations are so comprehensive that it may be virtually impossible to have a crash without a violation of at least one of those regulations. So, in interpreting exclusionary Clause 1-A, reference should be made to the following quotation from *Wood v. Kok* (1961), 58 Wn. (2d) 12, 16, 360 P. (2d) 576:

". . . The object of automobile liability insurance

coverage would be defeated if an insured was not afforded protection on occasions of his improvident or negligent conduct in the use of his automobile. . . ."

Thus, we find that the most reasonable interpretation of exclusionary Cause 1-A is that it only relates to those C.A.A. regulations pertaining to the certificate itself and not to all of the C.A.A. regulations in general. Therefore, the alleged overweight does not form the basis for an exclusion from insurance coverage under Clause 1-A, or any other exclusionary clause, so the disputed issue of fact is not material.

A similar conclusion was reached by the ninth circuit in *United States v. Eagle Star Ins. Co.* (1952), 196 F. (2d) 317.[2] In that case a plane had attempted to take off with an overload of approximately 28 per cent, and, in discussing an insurance provision quite similar to the instant exclusionary Clause 1-A, the court stated at page 321:

" . . . Although it is not questioned that a certificate of the kind mentioned [certificate of airworthiness] had been issued for this plane, yet appellees' position appears to be that the overloading operated to invalidate the certificate of airworthiness.

"We cannot come to any such conclusion without rewriting the policy. Had it been intended to make this first condition one which prohibited overloading or other violations of applicable regulations, it would have been a simple matter to find appropriate words to say so. . . ."

The appellant also alleges that Ezzell violated the terms of his pilot license by piloting for compensation or for hire on the flight in question, and thus is excluded from insurance coverage due to the provisions of Clause 1-A. It has been previously held in this opinion that the instant flight constituted a share-the-expense flight for the purposes of the insurance policy. And it would appear rather incongruous to hold that, although the policy expressly insures

---

[2]A rehearing was granted in this case and is reported in 201 F. (2d) 764. The original decision modified the trial court judgment in favor of the insurer and remanded, whereas on rehearing the entire judgment was reversed. Although 201 F. (2d) 764 reverses 196 F. (2d) 317, it did not affect the aspect of the case being herein discussed.

the share-the-expense flight, such coverage is defeated by implication under the clause relating to pilots' certificates. Therefore, we reject the appellant's contention on this point.

■ The trial court's Order Granting Plaintiff's Motion for Summary Judgment stated:

" . . . the Court having considered the arguments of counsel and the records and files herein including such portions of the transcript of the trial of the principal cause and such portions of the depositions of witnesses as counsel believed to be here pertinent, *and based upon the inferences drawn from the matters presented the court* that there are no conflicts in the evidence material to disposition of this cause . . . " (Italics ours.)

The appellant has assigned as error the trial court's acknowledged use of inferences in determining the instant summary judgment (see the italicized portion of the above-quoted order). An inference is a logical conclusion or deduction from an established fact, and it is necessary to draw certain inferences from the facts presented in order to cross the bridge into the realm of legal conclusions. If the facts and circumstances presented to the trial court in the instant case had been such that different or conflicting inferences might have been drawn therefrom, then the trial court would have been in error in granting a summary judgment. *Preston v. Duncan* (1960), 55 Wn. (2d) 678, 349 P. (2d) 605; *Braniff v. Jackson Ave.-Gretna Ferry, Inc.* (1960, 5th Cir.), 280 F. (2d) 523; *Sarkes Tarzian, Inc. v. United States* (1957, 7th Cir.), 240 F. (2d) 467; *United States v. Dollar* (1952, 9th Cir.), 196 F. (2d) 551. However, in examining the record we have concluded that the inferences referred to by the trial court were not "conflicting" inferences, but rather were "necessary" inferences, and that such could be properly considered on a motion for summary judgment.

It is hereby ordered that the judgment is affirmed.

OTT, C. J., DONWORTH, HUNTER, and HAMILTON, JJ., concur.

---

May 29, 1963. Petition for rehearing denied.