428 So.2d 1343 (1983)
Warren CAMPAGNA, Joseph Campagna, Mary Robin, d/b/a Madeline Enterprises and Campagna Fiberglass Skiff Corporation
v.
William E. SMALLWOOD, d/b/a W.E. Smallwood, Builder, and Home Indemnity Insurance Company.
No. CA-0274.
Court of Appeal of Louisiana, Fourth Circuit.
March 9, 1983.
*1344 Manuel A. Fernandez, Chalmette, for plaintiffs-appellees.
Owen A. Neff, Peter S. Title, Sessions, Fishman, Rosenson, Boisfontaine & Nathan, New Orleans, for defendants-appellants.
Before SCHOTT, GARRISON and BARRY, JJ.
BARRY, Judge.
This dispute arose out of a contract for the construction of a pre-engineered metal building to be used in plaintiff Warren Campagna's skiff manufacturing business. The contract between plaintiff and defendant-contractor, William Smallwood, was executed on 10/22/75 and provided the work was to commence within 90 days and be completed within 110 days. The contract price was $38,500 payable in five "progress payments" at various stages of the construction with the final payment due upon occupancy or acceptance, whichever was sooner. The contract contained the usual contractor's warranty of good workmanship, "free from defects," and provided payments could be withheld on account of "defective work not remedied" or "unsatisfactory *1345 prosecution of the work by the contractor." The contract provided that "all claims or disputes arising out of this contract or the breach thereof shall be decided in accordance with the Construction Industry Rules of the American Arbitration Association."
The construction was to be completed in two stages so that the owner could occupy the north half of the building when completed while the contractor worked on the south half. Toward the end of construction plaintiff became dissatisfied with defendant's work and presented defendant's project manager with two "punch lists" of items for correction or additional work. The items were not completed to plaintiffs' satisfaction and on February 16, 1976, plaintiff presented defendant with a consolidated punch list of 19 items. Two days later Smallwood submitted a list of proposed solutions to the problems. While defendant's men were working on those items, plaintiff moved into the second half of the building and began using the entire building.
Although many of the problems were corrected, several major defects, including misalignment of roof panels, two misdrilled roof panels, misalignment of an end wall, inadequate support for a one ton capacity monorail, and torn ceiling insulation, were not corrected to plaintiff's satisfaction. Plaintiff and defendant met on May 26, 1976 to resolve the remaining problems, and the next day plaintiff's attorney sent defendant a letter asserting the building was incomplete and did not meet the standards of good workmanship. The letter referred to the 19 punch list items and other deficiencies, and stated, "Please accept this letter as notice that if those conditions are not corrected within the next five days, you will be placed in default on this contract ...." That letter apparently crossed in the mail with a letter from defendant's attorney expressing defendant's willingness to supervise additional corrections or to employ a metal building erection specialist to effect necessary repairs. Defendant received plaintiff's letter on 5/31/76 and went to the job site the next day with a crew, but plaintiff refused to allow defendant to perform any work. Defendant's attorney wrote plaintiff's attorney on July 21 and again on August 31 attempting to resolve the matter amicably, but plaintiff refused to allow defendant to attempt further repairs.
On January 24, 1977 plaintiff sued for $35,000.00 to correct the roof and other deficiencies, and for $10,000.00 in consequential damages. On February 9, 1977, defendant advised plaintiff of his desire to settle the dispute by arbitration in accordance with the contract's arbitration clause. Defendant filed an exception of prematurity or, alternatively, moved to stay the proceedings pending arbitration. The trial court overruled defendant's exception and denied the stay.
Defendant then filed an answer and reconventional demand seeking $8,700.00 for the unpaid balance on the contract, plus $2,016.76 for extra work and alleged losses. Judgment was rendered for plaintiff for $28,600.00, consisting of $18,600.00 for a new roof, $6,500.00 for corrections to the monorail, and $3,500.00 for reworking walls and installing new louvers. The trial court did not render a judgment on defendant's reconventional demand.
On appeal defendant assigns as error the lower court's failure to dismiss this suit and require arbitration, the implied rejection of his reconventional demand, the excessive amount of damages, and the failure to find plaintiff refused to mitigate his damages.

ARBITRATION
Louisiana has a strong public policy in favor of arbitration[1] which our courts have recognized in numerous cases dealing *1346 with the timeliness of a party's demand for arbitration. In Matthews-McCracken Rutland Corp. v. The City of Plaquemine, 414 So.2d 756, 757 (La.1982), the Louisiana Supreme Court reaffirmed the legislative mandate to the courts to order arbitration when suit has been filed despite an arbitration agreement. The Court further declared,
... Because of the strong policy favoring the right to demand arbitration, a party's otherwise explainable conduct should be construed against waiver of the right.
and noted that only in extreme cases have courts found waiver of the right to demand arbitration.
However, during oral argument defendant's counsel acknowledged that the record is complete and stated that a remand would only cause additional delays. The purpose of arbitration is to avoid costly and lengthy litigation and for speedy resolution of contractual disputes. Spencer v. Hoffman, 392 So.2d 190, 191 (La.App. 4th Cir. 1980). That purpose has long since been rendered moot in this case. We agree that no purpose would be served by setting aside the judgment and remanding for arbitration.

PROOF OF DEFECTS AND COST OF REPAIRS
In his Reasons the Trial Judge found the building was:
"1. Out of square.
2. That this resulted in roof misalignment or that the misalignment in the roof resulted in this unsquareness of the structure.
3. That multiple leaks resulted therefrom.
4. That there is a sag or deflection in the mono-rail [sic] system which does somewhat hinder production."
The trial court stated it "was impressed with the testimony ... of Mr. John F. McCaskell ... and bases its awards upon his testimony" and cited his testimony that two-thirds of the roof was misaligned and "the only correct remedy was a new roof." The court also awarded sums for "necessary corrections to the monorail" and for reworking the walls and installing new louvers.
We find the evidence conflicting as to the extent of the defects and the necessary corrections. Defendant's witnesses agreed that a substantial number (one-half to two-thirds) of the metal roof panels were misaligned, that there was at least a 1½ inch deflection in the roof area supporting each of two exhaust fans, that 18 roof sheets were originally misdrilled and two have still not been replaced, and that there were numerous water leaks into the building. Defendant-contractor and his expert, Mr. Puckett (a local contractor) testified that despite misalignment the roof could be made watertight at a cost of $1300-$1500. Defendant's expert stated the deflection around the fans could be corrected by bracing, and the other leaks could be eliminated by replacing faulty fasteners. Defendant and his expert vehemently maintained a new roof is unnecessary.
According to plaintiffs' expert, Mr. McCaskell (a local contractor) the best way to correct a leak problem of this magnitude is by replacement of the entire roof. While Mr. McCaskell admitted the roof could "probably" be made watertight without replacement of every panel, he testified he could not guarantee the roof would be watertight.
Mr. McCaskell also testified there was a 2½ inch deflection in a monorail beam which was used to transport plaintiffs' skiffs out of the building. Although the monorail was to have a one ton capacity, plaintiff testified the roof and entire building shook when the monorail was operated. Campagna stated he was told by the manufacturer's representative the beam was unsafe, but the monorail was essential to plaintiffs' business so they continued to use the beam but had to support it by placing a post underneath.
Both parties conceded the rear end wall was misaligned and "leaned in." Mr. McCaskell thought this was caused by a strut supporting the monorail beam which *1347 pushed out the end wall. McCaskell also testified the louvers were of interior rather than exterior quality, there were problems with the flashings and leaks around many of the windows, there was insulation hanging out from the bottom of the wall panels, the roof overhang panels were mis-lapped, and there were other miscellaneous items requiring repair work.
The contract was for new construction, rather than repairs, and the trial court obviously felt plaintiffs were entitled to a properly aligned, watertight roof rather than a patch job that would "probably" make a misaligned roof watertight. We note a similar result in Hemphill v. Kaltenbach, 276 So.2d 733 (La.App. 3d Cir.1973), in which replacement of an entire roof was the only remedy for a defective roof. The trial court's fact-findings are entitled to great weight and should not be disturbed on appeal in the absence of manifest error. Canter v. Koehring, 283 So.2d 716 (La.1973). We find no such error in the lower court's conclusions as to the nature of the defects and the necessary remedies.
We do, however, find manifest error in the estimates for making the necessary repairs. The trial court found that "the plaintiffs who had utilized the building since 1976 could have remedied these conditions by [1978] and accordingly the court will use the 1978 figures in rendering the judgment." The uncontradicted evidence shows plaintiffs considered defendant in default as of May 27, 1976 and refused defendant any opportunity to make repairs after that date. Having decided defendant's work was unsatisfactory, plaintiffs were under a duty to mitigate their losses by having the work completed after dismissing defendant. Plaintiff consulted McCaskell about completing the work in July or August of 1976. He inspected the building, made an estimate, and offered to do the work at that time.
In Calais v. Dura-White Roofs Co., 208 So.2d 397 (La.App. 4th Cir.1968), this Court held a homeowner was obligated to minimize his damages resulting from a repairman's defective performance by having the roof fixed soon after discovery of the faulty workmanship, and the owner could not recover increased costs of the work due to his delay. Unlike the defendants in Heap v. Weber Constn. Co. of La., 407 So.2d 799 (La.App. 4th Cir.1981) and Unverzagt v. Young Builders, 252 La. 1091, 215 So.2d 823 (La.1968), defendant herein was not afforded equal opportunity with plaintiff to effect repairs or completion of the building and he should not be penalized for plaintiffs' delay. Therefore, the awards for the monorail and walls and louvers, based on 1978 estimates, should be reduced from $6,500.00 and $3,500.00, respectively, based on the 1978 estimates, to the 1976 estimates of $4,500.00 and $1,900.00, and the award for the roof decreased from $18,600.00 to $12,000.00. The total judgment reduction is $10,200.00.

DEFENDANT'S RECONVENTIONAL DEMAND
The trial court's Judgment and Reasons make no mention of defendant's reconventional demand for the contract balance due and other incidental losses. We presume defendant's claim was denied. Stringer v. Todd, 305 So.2d 696 (La.App. 4th Cir.1974). Plaintiffs contend the lower court "took into consideration what he believed to be the relative merits of defendant's reconventional demand and plaintiff-appellees' damage claim and offset the value of the latter's claim accordingly." We disagree. The Trial Judge's Reasons make it clear the total amount awarded to plaintiffs, $28,600.00, is the sum of the estimates given by plaintiffs' expert for repairs.
Defendant's right to recover the balance due on the contract depends on whether he substantially performed his obligations. If so, defendant is entitled to the contract price less the amount necessary for completion of the work. LSA-C.C. Art. 2769; Airco Refrigeration Service, Inc. v. Fink, 242 La. 73,134 So.2d 880 (1961). Substantial performance is found when the building may be used for the purpose intended, even though there are defects or incomplete items in the structure. As the *1348 court stated in Neel v. O'Quinn, 313 So.2d 286, 291 (La.App. 3d Cir.) cert. denied 319 So.2d 440 (1975): "Substantial performance by a contractor is readily found, despite the existence of a large number of defects in both material and workmanship, unless the structure is totally unfit for the purpose for which it was originally intended." (Emphasis in original.)
It is undisputed that plaintiff continuously utilized the building for his skiff manufacturing business since at least April, 1976. Defendant's witnesses testified plaintiff has occupied the entire building since February of 1976. Plaintiff stated his company used the front portion of the building as a showroom for their skiffs. The Trial Judge noted in his Reasons that "plaintiffs have utilized the building since 1976." Thus, we conclude defendant substantially performed under the contract and is entitled to recover the remainder of the contract price, less the amounts necessary to perfect the faulty work.
The total contract price was $38,500.00 and defendant was paid $29,800.00. The testimony revealed subsequent to the written contract, plaintiffs and defendant verbally agreed to add a monorail for $1,100.00. Plaintiffs do not dispute the price or the verbal agreement, but contend it is not enforceable because the contract provides that work changes must be "authorized by written change order." A written construction contract may be modified by subsequent oral agreement since a construction contract is not required to be in writing. Style Craft, Inc. v. Grassin, 347 So.2d 950 (La.App. 4th Cir.1977). See also 13 Am.Jur.2d Building and Construction Contracts, § 24, at 26. We also note that, as the monorail was one of plaintiffs' chief complaints and plaintiffs were awarded more than $1,100.00 for replacement of the original monorail, plaintiffs are estopped from denying their obligation was modified to include and pay for a monorail. Defendant is therefore entitled to an offset of $9,800.00, representing $8,700.00 due on the contract, and $1,100.00 for the monorail.
Defendant also seeks $757.67 for roof sheets with misdrilled holes which were left at the job site. The value of the sheets was not established nor is there sufficient evidence on defendant's claim for $159.00 in wages to employees who allegedly waited at the job site and were refused entry. The trial court ignored these items and there is no error in the implied rejection.
ACCORDINGLY, the judgment of the district court is amended as follows: The award in favor of plaintiff for repairs is reduced from $28,600.00 to $18,400.00; judgment is hereby entered in favor of plaintiff in reconvention for $9,800.00. Judgment in favor of plaintiff is therefore granted in the net amount of $8,600.00. Costs to be paid by each party.
AMENDED IN PART; REVERSED IN PART; RENDERED.
NOTES
[1] See Matthews-McCracken Rutland Corp. v. The City of Plaquemine, 414 So.2d 756, 757 (La.1982); State of Louisiana, Through the Division of Administration v. Algernon Blair, Inc., et al, 415 So.2d 612, 613 (La.App. 3d Cir.1982); Willis-Knighton Medical Center v. Southern Builders, Inc., 392 So.2d 505 (La.App. 2d Cir. 1980); In Re Schumacher, 389 So.2d 881 (La. App. 4th Cir.1980).