[No. 8523–6–III. Division Three. March 29, 1988.]

Maryhill Museum of Fine Arts, *Appellant,* v. Emil's Concrete Construction Company, et al, *Respondents.*

*John S. Moore, Jr.,* and *Velikanje, Moore & Shore,* for appellant.

*Walter G. Meyer, Jr., Meyer & Fluegge, Hugh A. Knapp,* and *Knapp, O'Dell & Knapp (David P. Templeton* and *Martin, Bischoff & Templeton,* of counsel), for respondents.

MUNSON, J.—Maryhill Museum of Fine Arts was awarded a judgment against Allen–McMath–Hawkins (architects) and Emil's Concrete Construction Company (Emil) jointly and severally. The museum appeals the court's award of

damages contending: (1) the damages should have been measured as of the time of the trial rather than the date the construction was completed and, alternatively, (2) prejudgment interest should have been awarded. Emil cross-appeals contending: (1) there was insufficient evidence of its negligence and failure to construct in a workmanlike manner, (2) there was insufficient evidence that it proximately caused the damage to the building, (3) the trial court erred in reducing the amount of the stipulated retainage, and (4) prejudgment interest should have been awarded on the retainage. The architects do not cross-appeal, but respond to the museum's and Emil's contentions. We affirm all issues except computation of damages; we remand for further findings as to damages.

Maryhill Museum of Fine Arts, a nonprofit Washington corporation, owns a historic building which it uses as a museum. Beginning in the 1970's, rain and melted snow began leaking into areas beneath the approach ramps and decks on the east and west wings of the main museum building.

In 1974, the museum retained the architects to reconstruct the ramps and decks to prevent water from leaking and to restore them to their original condition. The architects completed plans for the project in 1976; they decided to use bomanite, a brick–red concrete product, to cover the surface of the ramps. The museum accepted a bid from Emil, the exclusive dealer or franchisee of bomanite in our state.

Work commenced on the west ramp and deck by early fall of 1976. The existing covering and its underlying membrane were removed, exposing an uneven, rough and cracked concrete slab. Emil applied asphalt to the slab; placed a double layer of fiberglass membrane, designed by the architects, onto the asphalt; and then top mopped the membrane with asphalt.

Emil proposed laying 1 to 2 inches of sand on the membrane, instead of flex board pursuant to the architects' plans. The purpose of laying flex board was to protect the

membrane during construction. The architects submitted the change to the museum which approved it. The architects wrote to Emil approving the change. Emil also placed plywood on a portion of the membrane to protect it from power buggies weighing approximately 1 ton used during the construction.

Emil stopped construction on the west ramp until the spring of 1977. In the interim, a stucco contractor, hired independently of Emil to work on the adjoining walls and rails, placed a reglet in the building so that flashings could be installed. The stucco contractor applied an L-shaped copper flashing which ran down the inside of the adjoining walls and rested on the membrane. The stucco contractor's workers worked over the membrane. Emil mopped over a portion of the flashing resting on the membrane by a 12–inch wide layer of fiberglass and covered it with 1 or 2 inches of sand.

Before the work began, a subcontractor hired by Emil to apply the membrane complained to the architects about the sequence of the work. He expressed concern that the stucco work over the membrane could damage it; he met with Frank Allen of the architects, Emil Bulyca, owner of Emil, and the stucco contractor. No change in the sequence of the work was made. It was disputed whether this was a joint decision or a decision by Mr. Allen. Emil's workers also worked over the membrane.

In the spring of 1977, the subcontractor patched the west ramp where breaks in the membrane had become apparent. Emil poured the bomanite and completed the west ramp and deck. In the spring or summer of 1977, work commenced on the east ramp and deck. The sequence of the work was the same as for the west ramp and deck. The east ramp, however, was not left exposed over the winter. After the work was completed, water continued to leak into the building.

At the trial in January 1986, while witnesses testified to several possible causes for the leaking, none of them could identify for certain a particular cause.

The court issued two memorandum opinions. On March 11, 1986, it found the leaking was due to breaks in the membrane. The breaks were "probably" caused by a combination of three things: (1) the copper flashings on the outside walls of the ramps and decks had a different coefficient of expansion than the ramps and decks, causing the membrane to break away from the flashings; (2) the membrane was attached to the underlying cement slab without consideration for expansion and contraction of the slab, causing breaks in the membrane; and (3) both Emil's and the stucco contractor's workers worked on and walked over the membrane causing breaks in it. The court concluded the design of the covering of the ramps and decks was defective and the architects were liable for breach of warranty in that they expressly or impliedly warranted the design would stop the leakage. As to Emil's liability, the court stated: "There is evidence that the Defendant contractor was negligent in the lack of care taken to maintain the integrity of the membrane but the Court cannot conclude the extent, if any, that negligence caused the leaks." The court then concluded it "does believe the contractor was negligent but further concludes that his negligence is not a proximate cause of the damage. If it contributed at all, it is *de minimis*."

The court also explained Emil could not be liable for suggesting a change from flex board to sand because it was not a defect in design. Finding the museum to be unique and, thus, without a market value, the court determined the damages owed by the architects consisted of the cost to repair, including undoing what was done, even though it exceeded the original cost. The court then applied a multiplier of 1.71 to the damages, based on the testimony of one of the architects as to the increase in building costs from 1977 to the time of trial in 1986. It awarded Emil a judgment for the retainage in the stipulated amount.

On June 24, 1986, following the architects' motion for reconsideration, the court issued its second opinion, modifying the first. The court held the architects and Emil were

jointly and severally liable because they both impliedly warranted the resolution of the water leak. The court also found them concurrently liable because each breached a separate duty: the architects negligently designed a water-proof covering; Emil failed to build an impervious cover in a workmanlike manner. The court also held the application of the 1.71 multiplier was error because it would be the same as adding prejudgment interest and found the damages were $60,678.

On July 7, the museum moved the court to reconsider its second memorandum opinion and to reopen to admit additional evidence on damages. The court reopened and permitted discovery to ascertain the exact cost of the contract and the amount of Emil's retainage withheld by the museum.

On March 30, 1987, findings of fact and conclusions of law were entered in line with the court's second opinion; a judgment awarding the museum $62,137.43 was entered against Emil and the architects. This amount represented the total net cost of the project to the museum minus a retainage of $4,949.39 due Emil. It also awarded judgment for Emil against the architects to the extent of any payments made by Emil exceeding $28,594.01 and 50 percent of the museum's costs and accrued interest from the date of judgment. The museum appeals; Emil cross-appeals.

### THE MUSEUM'S APPEAL

The museum first contends the court erred in measuring the damages as of the date the project was completed rather than the date of trial. The general measure of damages for breach of contract permits the injured party to recover all damages accruing naturally from the breach and to be put into as good a pecuniary position as he would have been had the contract been performed. *Diedrick v. School Dist. 81,* 87 Wn.2d 598, 609–10, 555 P.2d 825 (1976). *Eastlake Constr. Co. v. Hess,* 102 Wn.2d 30, 47–48, 686 P.2d 465 (1984) adopted Restatement (Second) of Contracts § 348 (1981) as the appropriate rule for determining

damages in a construction case:

> (2) If a breach results in defective or unfinished construction and the loss in value to the injured party is not proved with sufficient certainty, he may recover damages based on
>
> (a) the diminution in the market price of the property caused by the breach, or
>
> (b) the reasonable cost of completing performance or of remedying the defects if that cost is not clearly disproportionate to the probable loss in value to him.

Here, none of the parties contends the court erred in applying (b), the reasonable cost of remedying the defects. The dispute is whether this cost is to be measured as of a reasonable time after the defect should have been discovered or as of the date of trial. The trial court in its second memorandum opinion stated:

> Damages should have been determined as of a reasonable time after the defects were discovered. *Eastlake Construction Company vs. Hess,* 33 Wn.App. 378, 655 P.2d 1160 (1982). To extrapolate the costs of repair to current prices would be the equivalent of grant[ing] prejudgment interest damages, the amount of which required a determination by the Court. Such enhancement is not proper. *Ski Acres Development Company vs. Gorman, Inc.,* 8 Wn.App. 775, 508 P.2d 1381 (1973); *Hellbaum vs. Burwell & Morford,* 1 Wn.App. 694, 463 P.2d 225 (1969).

Courts measure damages within a reasonable time after defects are discovered under the theory the nonbreaching party has a duty to mitigate losses by repairing the defects as soon as possible. *Campagna v. Smallwood,* 428 So. 2d 1343, 1347 (La. Ct. App. 1983); 22 Am. Jur. 2d *Damages* § 203 (1965). Although the nonbreaching party must use reasonable means to minimize its damages, the breaching party has the burden of showing that reasonable alternative courses of action were open to the nonbreaching party. *Smith v. King,* 106 Wn.2d 443, 450–51, 722 P.2d 796 (1986); *Young v. Whidbey Island Bd. of Realtors,* 96 Wn.2d 729, 732–34, 638 P.2d 1235 (1982); *Harper & Assocs. v. Printers, Inc.,* 46 Wn. App. 417, 423–24, 730 P.2d 733

(1986), *review denied,* 108 Wn.2d 1002 (1987). The duty to cure the defects can be suspended if the nonbreaching party could have reasonably expected the breaching party to perform. *Jet Boats, Inc. v. Puget Sound Nat'l Bank,* 44 Wn. App. 32, 43–44, 721 P.2d 18 (1986). *See also Heap v. Weber Constr. Co. of La., Inc.,* 407 So. 2d 799, 802 (La. Ct. App. 1981); *Unverzagt v. Young Builders, Inc.,* 252 La. 1091, 215 So. 2d 823 (1968); *Ecksel v. Orleans Constr. Co.,* 360 Pa. Super. 119, 519 A.2d 1021, 1028 (1987); *Fidelity & Deposit Co. v. Stool,* 607 S.W.2d 17, 25 (Tex. Civ. App. 1980). *Cf. Campagna v. Smallwood,* 428 So. 2d at 1347.

In such a case, damages should be measured at the time when the nonbreaching party knew or reasonably should have known the breaching party ceased its attempts to cure the defects. In the present case, the parties spent considerable time attempting to rectify the condition. At some time, it must have become apparent their efforts were to no avail. The trial court did not make a finding as to when the museum knew or should have known Emil would not cure the defects. It ruled as a matter of law the museum was not entitled to compute its damages as of the date of trial because it would be the same as awarding prejudgment interest. We remand for the trial court to make a factual determination, *i.e.,* that point in time when the parties' efforts ended and the lawsuit was pursued in earnest. That is the time at which the damages should be computed.

The museum next contends the court erred in refusing to award it prejudgment interest. Prejudgment interest is awarded

> (1) when an amount claimed is "liquidated" or (2) when the amount of an "unliquidated" claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard contained in the contract, without reliance on opinion or discretion.

*Prier v. Refrigeration Eng'g Co.,* 74 Wn.2d 25, 32, 442 P.2d 621 (1968); *see also Hansen v. Rothaus,* 107 Wn.2d 468, 472–73, 730 P.2d 662 (1986).

 The museum contends the amount owed was liquidated because the judge calculated it by taking the actual contract costs of the project plus the architects' fees and the add ons, and subtracting the amount of deductions. The museum cites *Prier* in support of its position. There, the court awarded prejudgment interest as of the date the repairs were completed because the cost of repairs was not disputed. *Prier,* at 35. In the present case, the costs and extent of the repairs were disputed. The court used its discretion in determining the reasonable cost of repairs would be the original contract cost of the project. Until that decision was made, the amount was not liquidated. *See North Pac. Plywood, Inc. v. Access Rd. Builders, Inc.,* 29 Wn. App. 228, 235, 628 P.2d 482, *review denied,* 96 Wn.2d 1002 (1981); *Hellbaum v. Burwell & Morford,* 1 Wn. App. 694, 703–05, 463 P.2d 225 (1969). Therefore, the court correctly refused to award prejudgment interest.

### EMIL'S CROSS APPEAL

On its cross appeal, Emil contends there was insufficient evidence to support the court's finding it was negligent or failed to perform in a workmanlike manner.[1] It also contends there was insufficient evidence Emil proximately caused the leaking. The court found three possible causes for the breaks in the membrane which caused the leaking: (1) the use of copper flashings with a different coefficient of expansion than the ramps and decks; (2) the fixing of the membrane to the concrete slab without accommodation for expansion and contraction; and (3) the failure of Emil to protect the membrane during construction.

The evidence is sufficient to support a finding Emil was negligent and failed to perform in a workmanlike manner. It was not disputed Emil's employees walked over and drove heavy equipment over the membrane. Even though Emil placed plywood on the membrane to protect it during

---

[1]Emil also contends there was insufficient evidence it was liable for breach of the warranty of sufficiency of design. However, the court did not find it liable on this theory and error is not so assigned.

construction, there was testimony Emil's employees did not always walk on the plywood, but walked on the exposed membrane. On one occasion, a witness saw a power buggy being driven on the surface and not on the plywood sheets. Emil acknowledged there were breaks in the membrane and attempted to repair them by mopping the east ramp and patching the west ramp. Mr. Bulyca admitted he could not be certain if some breaks were missed. Michael Wellman, the museum's engineer, testified it is not a good construction practice to work over the membrane. Findings of fact supported by substantial evidence will not be disturbed on appeal. *Bering v. Share,* 106 Wn.2d 212, 220, 721 P.2d 918 (1986), *cert. dismissed,* ___ U.S. ___, 93 L. Ed. 2d 990, 107 S. Ct. 940 (1987).

Emil also maintains none of the witnesses were able to pinpoint the exact cause of the leaking, but merely stated the breaks in the membrane were *possibly* caused by Emil's employees. Emil contends that because none of the witnesses testified the breaks in the membrane were *probably* caused by its employees, the evidence is insufficient to support such a finding. We disagree.

■ "A verdict does not rest on speculation or conjecture when founded upon reasonable inferences drawn from circumstantial facts." *Thompson v. Grays Harbor Comm'ty Hosp.,* 36 Wn. App. 300, 304, 675 P.2d 239 (1983). *See also Harrison v. Whitt,* 40 Wn. App. 175, 177, 698 P.2d 87, *review denied,* 104 Wn.2d 1009 (1985). Aaron Thompson, the architects' expert, testified working over the membrane was "definitely a major factor" in causing the breaks. The evidence and the reasonable inferences drawn therefrom reveals more than a mere possibility that Emil's negligence caused the breaks. Moreover, Mr. Wellman testified the breaks "undoubtedly" caused the water to penetrate the membrane. Because the court found Emil proximately caused the leaks, the court properly determined Emil was jointly and severally liable for the indivisible injury.

*Seattle–First Nat'l Bank v. Shoreline Concrete Co.*, 91 Wn.2d 230, 234–35, 588 P.2d 1308 (1978).[2]

 Emil also contends the court erred in calculating the amount of the retainage withheld by the museum from Emil. The parties had stipulated the museum retained $5,516.93 of the contract price from Emil, and the court originally determined Emil was entitled to that sum. However, when the court reconsidered its decision, it reopened the case to allow discovery to determine the exact cost of the contract. The parties determined the museum had paid on three invoices a total of $59,812.51 to Emil. The architects' fee was $2,324.92. The total amount paid by the museum was $62,137.43. The parties determined the total contract price was $67,086.82. The difference is $4,949.39. Therefore, this was the amount actually owed by the museum to Emil. Emil contends the stipulation setting the retainage at $5,516.93 was binding. Stipulations are valid unless a good, contrary reason is shown. *Smyth Worldwide Movers, Inc. v. Whitney*, 6 Wn. App. 176, 178, 491 P.2d 1356 (1971). Here, the court calculated the amount of the retainage by subtracting the amounts paid from the total contract price. The contract price was not determined until after the trial, well after the stipulation was entered into. Thus, it correctly gave Emil a credit for the actual amount retained.

---

[2]Emil also argues the indivisible injury rule is not applicable because (1) its acts and the architects' acts were not simultaneous and (2) there was direct evidence the architects' negligence proximately caused the damage. Emil cites Restatement (Second) of Torts § 433B (1966). However, this section only establishes who has the burden of proof as to causation. Section 433A(2) provides that damages, for which there are not distinct harms or a reasonable basis for determining the contribution of each cause to a single harm, are not to be apportioned among two or more causes. The comment provides that where two or more causes combine to produce a single result, incapable of division, and each is a substantial factor in causing the harm, each of the causes is responsible for the entire harm. The comment further provides that the causes do not have to be simultaneous. Also, there does not seem to be a requirement that both causes be proved by direct evidence.

Emil also contends it is entitled to prejudgment interest on the retainage because the parties agreed the amount of retainage is liquidated. However, the museum argues that if the court rejects its contention that its damages should be computed as of the trial date or its claims for prejudgment interest on those damages, then the court must also reject Emil's claim for prejudgment interest arising out of the same contract.

■ An unliquidated counterclaim does not affect the right to prejudgment interest on a liquidated claim. Otherwise, a defendant could defeat the plaintiff's right for prejudgment interest simply by setting up an unliquidated counterclaim. *Mall Tool Co. v. Far West Equip. Co.*, 45 Wn.2d 158, 177, 273 P.2d 652 (1954). A liquidated counterclaim can bear interest in its own right. *Mall Tool*, at 177. When the unliquidated counterclaim is based upon defective workmanship or defective performance by the plaintiff on the contract on which the liquidated claim is based, the liquidated claim is reduced by the unliquidated claim and interest is allowable only on the balance. *Mall Tool*, at 177. Here, Emil's claim for prejudgment interest on the retainage is not affected by the fact the museum's claim is unliquidated. However, Emil owed more to the museum than the museum owed to Emil; thus, Emil was not deprived of its retainage. *See Hartman v. Anderson*, 49 Wn.2d 154, 156–57, 298 P.2d 1103 (1956). Emil is not entitled to prejudgment interest.

We remand to the trial court to determine the time at which it became apparent the parties ceased their efforts to cure the defects and to compute the damages as of that date. We affirm all other issues.

McINTURFF, C.J., and GREEN, J., concur.

Reconsideration denied April 21, 1988.

Review denied by Supreme Court September 1, 1988.