[No. 49955-6-I. Division One. April 21, 2003.]

ROBERT EGERER, *Respondent*, v. CSR WEST, L.L.C., *Appellant*.

646

*J. Robert Leach,* for appellant.

*Ralph G. Phillips* and *William L. Weber* (of *Phillips & Webster, P.L.L.C.*), for respondent.

BECKER, C.J. — Appellant CSR West breached a contract to supply fill for land development. Issues on appeal include the calculation of damages based on "hypothetical cover"; the allowance of prejudgment interest; and the denial of the plaintiff's requests to include sales tax and consequential damages in the award of damages. We affirm in all respects.

## MEASURE OF DAMAGES

According to unchallenged findings of fact entered after a bench trial, Robert Egerer owned a 10-acre parcel of land in Skagit County that he planned to develop into commercial property. The property required a considerable amount of fill to make it suitable for development.

Egerer first purchased fill material in 1995, when he contracted at the rate of $1.10 per cubic yard to have Wilder Construction haul to his property some material being excavated from the shoulders of Interstate 5 as a part of a highway improvement project. In its suitability to serve as structural fill, the shoulder material resembled a gravel known as "pit run," but it was cheaper than pit run because it contained asphalt grindings.

Beyond what Wilder Construction could supply, Egerer needed roughly 17,000 cubic yards of fill material. In May 1997, Egerer learned that CSR West had contracted with the Washington State Department of Transportation to excavate material from the shoulder areas of Interstate 5 near Lake Samish. He met with John Grisham, CSR's sales manager, and they reached an agreement to have CSR transport "all" the shoulder excavations from the project to Egerer's site at the rate of $.50 per cubic yard.

CSR brought fill material to Egerer's property on only two nights: July 9 and 10, 1997. Shortly thereafter, the Department of Transportation issued a change order that allowed CSR to use the excavated shoulder material in the reconstruction of the shoulder area. It was more profitable for CSR to supply the material for the State's use than to fulfill its contract with Egerer. CSR excavated a total of 16,750 cubic yards of material during its work on the shoulder project in 1997 and supplied virtually all of it to the Department of Transportation.

Egerer did not purchase replacement fill at the time of the breach in July 1997. Asked about this at trial, he explained that it would have been too expensive, and he also did not think there was time to find replacement fill

and get it onto his property before the end of the summer. Egerer said that his window of opportunity to place fill on the property was June through September, before the weather became too wet. In January and February 1998, he obtained price quotes for pit run ranging from $8.25 per cubic yard to $9.00 per cubic yard. These prices exceeded Egerer's budget, and he did not contract for replacement fill at that time either.

In the summer of 1999, Egerer learned of an unexpected landslide at a gravel pit not far from his property. The company agreed to sell Egerer the unwanted slide material at a cost of $6.39 per cubic yard, including the cost of hauling and spreading.

Egerer filed suit in November 2000, alleging that CSR breached its contract by failing to deliver all the excavated shoulder material in the summer of 1997. After a bench trial, the court found breach. The court then turned to the Uniform Commercial Code to determine the measure of damages. CSR raises several legal issues with respect to the award of damages.

■ The findings, which are unchallenged, are deemed verities on appeal. We review conclusions of law de novo to see if they are supported by the trial court's findings of fact. *Bingham v. Lechner*, 111 Wn. App. 118, 127, 45 P.3d 562 (2002).

Where a seller fails to make delivery of goods sold to a buyer, the buyer has two alternative remedies under the Uniform Commercial Code (U.C.C.). One is the remedy of "cover": the buyer may purchase substitute goods and recover as damages the difference between the cost of this cover and the contract price, provided the buyer covers in good faith and without unreasonable delay. RCW 62A.2--712. The other, a complete alternative, is damages for nondelivery, also known as "hypothetical cover":[1] the buyer may recover as damages from the seller "the difference

---

[1] *Allied Canners & Packers, Inc. v. Victor Packing Co.*, 162 Cal. App. 3d 905, 911-12, 209 Cal. Rptr. 60, 61 (1984).

between the market price at the time when the buyer learned of the breach and the contract price." RCW 62A.2--713. This measure applies only when and to the extent that the buyer does not cover. U.C.C. cmt. 5, RCWA 62A.2-713. "The general baseline adopted in this section uses as a yardstick the market in which the buyer would have obtained cover had he sought that relief." U.C.C. cmt. 1, RCWA 62A.2-713. "The market or current price to be used in comparison with the contract price under this section is the price for goods of the same kind and in the same branch of trade." U.C.C. cmt. 2, RCWA 62A.2-713.

The court determined that Egerer was limited to damages for nondelivery under section 2-713: "Mr. Egerer is limited to damages reflecting the difference between CSR contract price and the price he could have obtained replacement material for at the time of the breach in 1997. *See* RCW 62A.2-713(1) and Comment 3."[2] The court found that Egerer could have obtained replacement material at the time of the breach for a cost of $8.25 per cubic yard—a price quoted to Egerer in early 1998. The court calculated his damages for the nondelivery of fill to be $129,812.50, which was the difference between the market price of $8.25 per cubic yard and the contract price of $.50 per cubic yard.

CSR accepts the trial court's decision to apply the remedy furnished by section 2-713, but contends the court erred by calculating damages based on a market price of $8.25 per cubic yard for pit run. CSR argues that $8.25 was not "the price for goods of the same kind" (as U.C.C. comment 2 calls for) because pit run is a product superior to shoulder excavations containing asphalt grindings. CSR further argues that $8.25 was not "the market price at the time when the buyer learned of the breach" (as RCW 62A.2-713 calls for) because the breach was in July 1997 and the $8.25 price was as of six months later—in January, 1998. CSR takes the position that the trial court should instead have used the $1.10 per cubic yard price reflected in Egerer's 1995

---

[2] Clerk's Papers at 30.

contract with Wilder Construction because that was the only evidence in the record of a price for shoulder excavations. Use of the much higher price for pit run resulted in a windfall for Egerer, according to CSR.

The trial court expressly relied on comment 3 to U.C.C. 2-713 in determining that $8.25 per cubic yard was the price for which Egerer could have obtained replacement material at the time of the breach. That comment states in part, "When the current market price under this section is difficult to prove the section on determination and proof of market price is available to permit a showing of a comparable market price or, where no market price is available, evidence of spot sale prices is proper." U.C.C. cmt. 3, RCWA 62A.2-713. The section on determination and proof of market price provides,

> If evidence of a price prevailing at the times or places described in this Article is not readily available the price prevailing within any reasonable time before or after the time described or at any other place which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described may be used, making any proper allowance for the cost of transporting the goods to or from such other place.

RCW 62A.2-723(2).

A court is granted a "reasonable leeway" in measuring market price under RCW 62A.2-723. *Sprague v. Sumitomo Forestry Co.*, 104 Wn.2d 751, 760, 709 P.2d 1200 (1985). Contrary to CSR's argument, a trial court may use a market price for goods different in quality from those for which the buyer contracted. That possibility is encompassed in the reference to "price . . . which in commercial judgment or under usage of trade would serve as a reasonable substitute for the one described." And RCW 62A.2-723 expressly permits looking to a price "prevailing within any reasonable time before or after the time described."

We conclude the trial court did not misapply the law in concluding that the January 1998 price for pit run was the relevant market price. The court found the 1998 quotes for

replacement material and hauling "were reasonable and customary" and noted that CSR "did not offer evidence that suitable replacement material was available at a lower price at the time of breach."[3] There was testimony that shoulder excavation material, though cheap when available, is rarely available. John Grisham, CSR's sales manager, acknowledged that it would have been difficult for Egerer to locate an alternative supplier of shoulder excavations in 1997 because "quantities like that are few and far between."[4] Grisham said he was unaware of any other pit in the area that would have had similar material available at a price anywhere near $.50 per cubic yard in the summer of 1997. Egerer's eventual purchase in 1999 was possible only because of the landslide that unexpectedly deposited unwanted fill material in a local gravel pit. If Egerer had covered at the time of the breach, higher-priced pit run would have been a reasonable substitute for the shoulder excavations.

■ Egerer, in his cross-appeal, argues that the relevant market price was much higher. He contends the trial court should have based its calculation of damages on figures showing that the Washington Department of Transportation was paying CSR between $33.33 and $46.80 per cubic yard for gravel pit material at that time. But the record does not indicate that Egerer made any argument below based on figures in CSR's contract with the State, and we will not consider it for the first time on appeal.

## PREJUDGMENT INTEREST

The court determined that Egerer was entitled to prejudgment interest totaling $70,098.75, calculated at the statutory rate "beginning in July 1997 when CSR retained profits from the breach."[5] The award was based on the

---

[3] Finding of Fact 83.

[4] Verbatim Report of Proceedings at 104.

[5] Clerk's Papers at 30.

court's conclusion that Egerer's damages were liquidated.[6] CSR challenges this conclusion.

■ Prejudgment interest is awardable for a liquidated claim. *Prier v. Refrigeration Eng'g Co.*, 74 Wn.2d 25, 32, 442 P.2d 621 (1968). A claim is liquidated where "the evidence furnishes data which, if believed, makes it possible to compute the amount with exactness, without reliance on opinion or discretion." *Prier*, 74 Wn.2d at 32 (citing CHARLES T. MCCORMICK, HANDBOOK ON THE LAW OF DAMAGES § 54, at 213 (1935)). A claim is unliquidated "where the exact amount of the sum to be allowed cannot be definitely fixed from the facts proved, disputed or undisputed, but must in the last analysis depend upon the opinion or discretion of the judge or jury as to whether a larger or a smaller amount should be allowed." *Prier*, 74 Wn.2d at 33 (quoting MCCORMICK, *supra*, § 54, at 216).

CSR argues that Egerer's claim required the trial court, as fact finder, to exercise discretion in deciding to use the January 1998 price of pit run as the market price, rather than the actual price Egerer paid for landslide gravel in the summer of 1999 or the Wilder contract price for shoulder excavations.

■ The fact that a claim is disputed does not render the claim unliquidated, so long as it may be determined by reference to an objective source such as fair market value. *Aker Verdal A/S v. Neil F. Lampson, Inc.*, 65 Wn. App. 177, 190, 828 P.2d 610 (1992). "However, when determining the *measure* of damages requires the exercise of discretion by the factfinder, the claim is unliquidated." *Aker Verdal A/S*, 65 Wn. App. at 191 (plaintiff made in-house repairs to part of damaged crane, and jury decided to measure damage as the internal cost of labor and materials rather than as the rate plaintiff could have charged the customer if crane had not collapsed; held, cost of in-house repair was unliquidated). *See also Maryhill Museum of Fine Arts v. Emil's Concrete Constr. Co.*, 50 Wn. App. 895, 903, 751 P.2d

---

[6] Clerk's Papers at 30.

866, *review denied*, 111 Wn.2d 1009 (1988) (damages were unliquidated where finder of fact used discretion to determine that damages for breaching a contract to reconstruct a unique building would be the original cost of the contract).

■ Unlike in *Aker Verdal A/S* and *Maryhill Museum of Fine Arts*, here the measure of damages to be used was not left to the discretion of the fact-finder; it was fixed by statute as the difference between the contract price and the prevailing market price at the time of the breach. The facts are more like those in *Dautel v. Heritage Home Center, Inc.*, 89 Wn. App. 148, 948 P.2d 397 (1997), *review denied*, 135 Wn.2d 1003 (1998). In that case, the plaintiff sued for back wages, including unpaid commissions. The trial court found the plaintiff was owed a 20 percent commission on two transactions rather than a 10 percent commission, as the employer contended. On appeal, this court held that the trial court had erroneously refused to award prejudgment interest:

> Regarding the claim for unpaid commissions, the dispute between the parties related to the proper percentage Dautel was entitled to be paid. The amount actually owing could be computed with exactness once the trial court determined that Dautel was entitled to her full commission rate of 20 percent. Therefore, the amount was a liquidated sum.

*Dautel*, 89 Wn. App. at 155.

Like *Dautel*, where the trial court exercised discretion only to find the appropriate commission percentage, the trial court here exercised discretion only to find the appropriate market price. The amount CSR actually owed could be computed with exactness once the trial court found that $8.25 per cubic yard was the market price at the time Egerer learned of CSR's breach.

CSR cites authority stating that a defendant should not be required to pay prejudgment interest in cases where the defendant is unable to ascertain the amount owed to the plaintiff. *Aker Verdal A/S*, 65 Wn. App at 189 (citing *Hansen v. Rothaus*, 107 Wn.2d 468, 473, 730 P.2d 662

(1986)). But while CSR did not know precisely how much it would owe to Egerer until judgment was rendered, $8.25 per cubic yard was found to be a reasonable and customary rate and thus was within a range of market values readily ascertainable by CSR. That is enough to make the damages liquidated in cases where the measure of damage is market or current value:

> Where this is so, while the person who is charged with the duty of paying this valuation could probably not have known when the duty to pay arose, with entire exactness, the precise figure at which the value would be fixed, he could have estimated it within a narrow range of possible variation.

McCORMICK, *supra*, § 55, at 218.

That CSR proposed a lower market price does not render the claim unliquidated. The fact finder believed evidence showing that $8.25 was the market price, and that evidence made it possible to compute exact damages without reliance on opinion or discretion. *See Prier*, 74 Wn.2d at 32.

■ CSR further argues that prejudgment interest, if awardable, should accrue from the time Egerer bought replacement fill in June 1999, not—as the trial court concluded—from the time of the breach in 1997. CSR cites authority stating that an injured party "should be compensated for the 'use value' of money it was forced to spend to cover its loss." *Aker Verdal A/S*, 65 Wn. App. at 189. CSR reasons that Egerer did not lose the use value of money until he actually made a replacement purchase in June of 1999 and that an award of prejudgment interest before that date constitutes a windfall for Egerer because it compensates him for the use of his money during a time when he still retained its use.

This is not, however, a case where damages were measured by the differences between the cost of cover and the contract price. Egerer's purchase in June 1999 was not cover. His damages were measured as "the difference between the market price *at the time the buyer learned of the*

*breach* and the contract price." RCWA 62A.2-713 (emphasis added). Awarding prejudgment interest from the time of the breach is consistent with the section 2-713 measure of damages and with its purpose—to discourage sellers from repudiating their contracts as the market rises. *TexPar Energy, Inc. v. Murphy Oil USA, Inc.*, 45 F.3d 1111, 1114 (7th Cir. 1995). The award of prejudgment interest from the time of CSR's breach is also consistent with the *Restatement (Second) of Contracts*:

> If the breach consists of a failure to pay a definite sum in money or to render a performance with fixed or ascertainable monetary value, interest is recoverable from the time for performance on the amount due less all deductions to which the party in breach is entitled.

RESTATEMENT (SECOND) OF CONTRACTS § 354, at 150 (1981). The comment to this section states:

> This Section deals with an injured party's right to interest as damages in compensation for the deprivation of a promised performance. Had the performance been rendered when it was due, the injured party would have been able to make use of it. Interest is a standardized form of compensation to the injured party for the loss of that use . . . .

RESTATEMENT (SECOND) OF CONTRACTS § 354 cmt. a (1981).

CSR promised to supply fill to Egerer at a price he could afford. The breach deprived him of the opportunity to advance his development plans in the summer of 1997 because, as the record indicates, cheap fill is rarely available. We conclude that the trial court properly selected July 1997, the date of breach, as the initiation point for the award of prejudgment interest.

## SALES TAX

■■ Egerer contends in his cross-appeal that the trial court erred by refusing to include in his damages the sales tax he would have paid had he actually covered. An award of damages may include an amount for sales tax

actually incurred by the injured party. *See State v. Gilbert,* 79 Wn. App. 383, 385, 902 P.2d 182 (1995). But Egerer did not actually incur any obligation to pay sales tax to the state of Washington; his cover was hypothetical, not actual. The sales tax is not an inherent part of the "market price" referred to in RCW 62A.2-713. We reject this claim.

## CONSEQUENTIAL DAMAGES

Egerer also challenges the trial court's denial of his request for consequential damages. He sought consequential damages in the form of lost rents for a period of 24 months, on the theory that CSR's breach caused a two-year delay in completion of the commercial building space.

A buyer may recover consequential damages resulting from a seller's breach where the loss results from general or particular needs of the buyer that the seller had reason to know about at the time of contracting. RCW 62A.2-715(2), (2)(a). The trial court concluded that CSR did not have reason to know of Egerer's requirements or needs at the time it entered into the contract. The unchallenged findings of fact amply support this conclusion. While Egerer may have had prospective tenants in the summer of 1997, he "never told anyone at CSR about the prospective tenants for his building." Egerer "did not discuss any specific details" about his development plans during his meeting in June 1997 with CSR's sales manager, Grisham. And he "never discussed with anyone from CSR a time line for development of his site."[7] On this record, the trial court properly denied Egerer's request for consequential damages.

Affirmed.

Cox and Schindler, JJ., concur.

---

[7] Findings of Fact 64, 66, 67; Clerk's Papers at 26.