189 P.3d 777 (2008)
143 Wash.App. 753
POLYGON NORTHWEST COMPANY and Sammamish Pointe, LLC, Plaintiffs,
v.
AMERICAN NATIONAL FIRE INSURANCE COMPANY, a corporation, American States Insurance Company, a Washington corporation, Commercial Underwriters Insurance Company, a corporation; Safeco Insurance Company of America, a corporation; Transportation Insurance Co., a corporation; Truck Insurance Exchange, a corporation; Valley Insurance Company, a corporation; and Zurich NA, a corporation, Defendants,
Great American Insurance Company, a corporation, Appellant,
Assurance Company of America, a corporation, and Ohio Casualty Insurance Company, a corporation, Respondents.
No. 58173-2-I.
Court of Appeals of Washington, Division 1.
April 7, 2008.
*781 Laurie Doran Kohli, Porter Kohli & LeMaster PS, Seattle, WA, Peter Whalen, Kathryn C. Ashton, Duane Morris LLP, San *782 Francisco, CA, for Appellant/Cross-Respondent.
Jacquelyn A. Beatty, Attorney at Law, Irene Margret Hecht, Keller Rohrback LLP, Guy M. Bowman, Joseph D. Hampton, Catherine Elaine Pruett, Betts Patterson Mines PS, Seattle, WA, for Respondent/Cross-Appellant.
DWYER, J.
¶ 1 This appeal arises out of the equitable reapportionment of financial obligations arising from the settlement that ended a construction defect lawsuit against Polygon Northwest Company (Polygon), a property development company. Some insurers recognized their obligation to contribute financially to the cost of funding the settlement; another, Great American Insurance Company (Great American), refused to pay. Great American  an umbrella or "excess" insurer  now contends that the trial court erred by finding it liable because its underlying insurer, United Capitol Insurance Company (United Capitol), was insolvent and made no payments toward the settlement. Great American further contends that even if its excess coverage was triggered, the trial court erred by ordering it to pay amounts exceeding those that it was required to pay under the terms of its policies.
¶ 2 We agree with the trial court that it was not necessary, under the terms of Great American's policies, that United Capitol, or anyone else, actually pay United Capitol's policy limits in order for Great American's excess coverage to be triggered. We conclude, however, that the trial court misapplied the governing law with respect to several issues when it determined how much of the amounts already paid in settlement equitably should have been paid by each of the various insurers involved in this litigation. Thus, we hold that the trial court abused its discretion in crafting its equitable contribution award. Accordingly, we remand this case to the trial court to reapportion the obligations of the insurers with regard to the Polygon settlement by exercising its discretion in accordance with the legal analysis of the parties' obligations as set forth herein.
¶ 3 We also conclude that the trial court erred by classifying the "litigation costs" portion of the Polygon settlement as "supplementary payments" payable under Assurance Company of America's (Assurance) primary insurance policy. Therefore, we reverse that determination and direct the trial court on remand to include in the reallocation of liability among the excess insurers the "litigation costs" that it previously allocated solely to Assurance.
¶ 4 We further hold that the trial court did not abuse its discretion by assessing prejudgment interest against Great American and Ohio Casualty Insurance Company (Ohio), but that the award of prejudgment interest against Great American and Ohio must be adjusted on remand to conform to their revised contribution obligations.
¶ 5 Finally, we hold that the trial court did not err by awarding less than the amount of attorney fees sought by Assurance, and that none of the parties are entitled to an award of attorney fees on appeal.

I

Facts
¶ 6 Assurance and Ohio brought claims against Great American for equitable contribution to a settlement funded by Assurance and Ohio on behalf of their mutual insured, Polygon. The lawsuit giving rise to the settlement was brought by the homeowners association of a condominium project known as Sammamish Pointe against Polygon, the builder. The association alleged the existence of various serious construction defects arising prior to 1996 and continuing through 2000.
¶ 7 Polygon tendered defense of the Sammamish Pointe action to its liability insurers, including Assurance, Ohio, United Capitol, Great American, and Commercial Underwriters Insurance Company (CUIC). The total primary insurance available to Polygon was $2 million. United Capitol, which had issued an additional $2 million in primary coverage for 1998-2000, became insolvent in November 2000. Assurance and Ohio had issued excess insurance policies covering up to $10 million in losses for the years in which Assurance *783 and CUIC were primary insurers, 1996-1997 and 1997-1998, respectively. Great American was the excess insurer for the two policy years in which United Capitol was the primary insurer, extending $50 million in coverage for each year. Polygon's liability insurance is illustrated in the following table:

Coverage Companies on Companies on Companies on Companies on
Level Risk: 1996-97 Risk: 1997-98 Risk: 1998-99 Risk: 1999-2000
--------------------------------------------------------------------------
 Assurance CUIC United Capitol United Capitol
 (Insolvent) (Insolvent)
Primary Policy Limits: Policy Limits: Policy Limits: Policy Limits:
 $1 million $1 million $1 million $1 million
--------------------------------------------------------------------------
 Assurance Ohio Great American Great American
Excess Policy Limits: Policy Limits: Policy Limits: Policy Limits:
 $10 million $10 million $50 million $50 million
--------------------------------------------------------------------------

Assurance, along with CUIC, United Capitol (before its insolvency), and two other insurers, Valley Insurance Company (Valley) and Truck Insurance Exchange (Truck), funded Polygon's defense.[1]
¶ 8 Following mediation, Polygon reached a $7.8 million settlement with the homeowners. Of the settlement, $6,314,000 was dedicated to the payment of claims and $1,486,000 was dedicated to the payment of the homeowners' "litigation costs." Great American refused to participate in funding the settlement, maintaining that its excess coverage had not been triggered because of United Capitol's failure to pay its underlying policy limits. The participating insurers paid into the settlement as follows:

 Assurance $5,413,666.67
 CUIC $1,743,000.00
 Ohio $ 483,333.33
 Valley $ 100,000.00
 Truck $ 60,000.00
 TOTAL $7,800,000.00

The settlement provided that Polygon, Assurance, and Ohio would jointly pursue claims against those subcontractors whose faulty work had contributed to the property damage. Expenses and recoveries of these collateral actions were to be shared.[2] Because Great American neither participated in nor agreed to fund the settlement, Polygon did not enter into any agreement with Great American.
¶ 9 In an effort to facilitate the settlement, CUIC and Assurance had each agreed to pay half of the $1,486,000 classified as the homeowners' "litigation costs" pursuant to the "supplementary payments" provisions of their policies, which obligated them to pay various legal costs in addition to their primary liability policy obligations. Thus, Assurance and CUIC each paid $743,000 more than their respective $1 million primary general liability policy limits to fund the Polygon settlement. Following the settlement, CUIC voluntarily dismissed all of its claims with prejudice, with the exception of its claim to seek a refund of the $743,000 classified as "supplementary payments," which was dismissed without prejudice. CUIC never refiled a separate action against any of the other insurers and was not a party to any of the subsequent trial court proceedings in this cause. Assurance and Ohio, however, continued as parties to the lawsuit. Assurance *784 sought additional contribution from Ohio, and both Assurance and Ohio sought equitable contribution from Great American.
¶ 10 Based on the specific language of Great American's insurance agreement with Polygon, the trial court concluded that Great American's defense to coverage  that the aggregate limits of all of Polygon's primary insurance policies must be paid before Great American's policy was triggered  was faulty. The court ruled that because Polygon's legal liability clearly exceeded the $1 million limit of each of United Capitol's underlying policies, Great American was required to contribute to the settlement. The trial court subsequently characterized the $2 million not paid by United Capitol because of its insolvency as a "gap" in primary coverage. It determined that equity required that no single insurer should be wholly liable for this "gap" but that, rather, "[a]pportionment for the excess liability shall be equal for all four policy periods among the three excess carriers." Clerk's Papers (CP) at 1121-27, 1130.
¶ 11 Based on this apportionment of excess coverage liability, the parties signed a stipulation on September 18, 2003, that set forth how the trial court should offset contributions by additional third party recoveries. Ultimately, however, the trial court rejected this stipulation as a misapplication of the settlement terms.
¶ 12 On March 13, 2006, the trial court also ruled that the $1,486,000 of the homeowners' "litigation costs" split between Assurance and CUIC as the solvent primary insurers were "costs taxed against the insured" in the lawsuit and, as such, had been correctly characterized as the responsibility of Assurance and CUIC pursuant to the "supplementary payments" provisions of their primary insurance policies. The trial court further concluded that the underlying settlement amount was a liquidated sum and awarded prejudgment interest from the date of settlement to Assurance from both Great American and Ohio. Finally, the trial court concluded that Assurance and Ohio were Polygon's assignees with respect to the contribution action and awarded attorney fees with respect to the coverage dispute. The trial court did not, however, award fees incurred in the contribution action relating to issues other than the establishment of Great American's liability on its excess policy.
¶ 13 Great American appeals. Ohio cross-appeals the award of prejudgment interest to Assurance. Assurance, in turn, cross-appeals the trial court's characterization of the homeowners' attorney fees as "supplementary payments," as well as its limitations on the attorney fee award. CUIC attempts to appeal the trial court's ruling on Assurance's supplementary payments coverage.

II

Preliminary matters

Standards of Review
¶ 14 The interpretation of an insurance policy is a question of law, reviewed de novo. Alaska Nat'l Ins. Co. v. Bryan, 125 Wash.App. 24, 30, 104 P.3d 1 (2004). Insurance policies are construed as a whole and "`given a fair, reasonable, and sensible construction.'" Kitsap County v. Allstate Ins. Co., 136 Wash.2d 567, 575, 964 P.2d 1173 (1998) (quoting Queen City Farms, Inc. v. Central Nat'l Ins. Co., 126 Wash.2d 50, 65, 882 P.2d 703, 891 P.2d 718 (1994)). "A policy is considered as a whole so that the court can give effect to every clause in the policy." Kitsap County, 136 Wash.2d at 575, 964 P.2d 1173. "If terms are defined in a policy, then the term should be interpreted in accordance with that policy definition." Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173. If terms are not defined, then they are to be given their "`plain, ordinary, and popular' meaning." Kitsap County, 136 Wash.2d at 576, 964 P.2d 1173 (quoting Boeing Co. v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 877, 784 P.2d 507 (1990)). We review equitable remedies fashioned by the trial court for abuse of discretion. Sorenson v. Pyeatt, 158 Wash.2d 523, 531, 146 P.3d 1172 (2006). A trial court necessarily abuses its discretion "if it base[s] its ruling on an erroneous view of the law." Wash. State Physicians Ins. Exch. & Ass'n v. Fisons Corp., 122 Wash.2d 299, 339, 858 P.2d 1054 (1993).

*785 Participation of CUIC

¶ 15 "Only an aggrieved party may seek review by the appellate court." RAP 3.1. Great American assigns error to a ruling by this court's commissioner refusing to grant Great American's motion to strike CUIC's notice of appeal.[3] Great American contends that CUIC is not an "aggrieved party" within the meaning of RAP 3.1. "An aggrieved party is one whose proprietary, pecuniary, or personal rights are substantially affected." Cooper v. City of Tacoma, 47 Wash.App. 315, 316, 734 P.2d 541 (1987). CUIC contends that it falls within this definition because it contributed funds to the Polygon settlement based on its own interpretation of its policy's "supplementary payments" provision, and that Assurance's cross-appeal addresses the identical interpretation by the trial court with respect to the "supplementary payments" provision in Assurance's primary-layer policy. We conclude, however, that the trial court's rulings on another insurer's policy do not serve to make CUIC either aggrieved or a party within the meaning of RAP 3.1. Accordingly, we hold that CUIC lacks standing to appeal and order CUIC's appeal dismissed.
¶ 16 CUIC fundamentally misunderstands who qualifies as an "aggrieved party" under RAP 3.1. CUIC may or may not feel "aggrieved" by our opinion in this case, insofar as it prefers that we reach a different outcome on an issue. But it is not the outcome of our decision that makes a party "aggrieved" under RAP 3.1. Rather, the pertinent inquiry is whether the trial court entered a judgment that substantially affects a legally protected interest of the would-be appellant. See Sheets v. Benevolent & Protective Order of Keglers, 34 Wash.2d 851, 856, 210 P.2d 690 (1949) (appellant must be aggrieved by "judgment, order, or decree" of the trial court). Here, the judgment entered by the trial court in no way affects any of CUIC's rights. It does not order CUIC to do anything. It does not order CUIC to pay anything. It does not order CUIC to refrain from doing or paying anything. At the time judgment was entered, CUIC was not a party to this lawsuit. Its interests were in no way affected by the judgment from which it now seeks to appeal. Indeed, as has been previously held, "having taken a voluntary dismissal [of its claim], it has waived the jurisdiction of both the trial and appellate courts with respect to the merits of its claim." Cork Insulation Sales Co. v. Torgeson, 54 Wash.App. 702, 707, 775 P.2d 970 (1989).
¶ 17 In rare cases, a person who is not formally a party to a case may have standing to appeal a trial court's order because the order directly impacts that person's legally protected interests. Thus, in the case of In re Guardianship of Lasky, 54 Wash.App. 841, 848-50, 776 P.2d 695 (1989), we held that an attorney was an "aggrieved party" for purposes of appealing from an order imposing sanctions against him, but was not an "aggrieved party" for purposes of appealing from an order removing him as the legal guardian of an incompetent adult. See also State v. G.A.H., 133 Wash.App. 567, 575-76, 137 P.3d 66 (2006) (Department of Social and Health Services could appeal, even though not a named party, because juvenile court ruling ordered Department to assume responsibility for minor's welfare); Breda v. B.P.O. Elks Lake City 1800 So-620, 120 Wash.App. 351, 353, 90 P.3d 1079 (2004) (sanctioned attorney became "aggrieved party" for purposes of appealing sanctions imposed directly against him); Splash Design, Inc. v. Lee, 104 Wash.App. 38, 44, 14 P.3d 879 (2000) (same). However, unlike in those cases, nothing in the trial court judgment currently on appeal purports to affect any of CUIC's proprietary or pecuniary interests.
¶ 18 On the contrary, none of the four trial court rulings that CUIC listed in its purported notice of appeal even mention CUIC. The first is an interlocutory oral ruling by the trial court  entered after CUIC had voluntarily dismissed all of its claims  concluding that the remaining "litigation costs" portion *786 of the Polygon settlement was covered by the "supplementary payments" provision in Assurance's primary-layer insurance policy. The second is the trial court's denial of Assurance's motion to reconsider that ruling. The third is the parties' agreed order confirming the sums defined as "supplementary payments" in the oral ruling. The fourth is the trial court's final judgment. Of these rulings, only the trial court's final judgment is appealable as a matter of right pursuant to RAP 2.2(a). CUIC is nowhere named in that final judgment, nor does that judgment directly or indirectly impose any obligations or restrictions upon CUIC.
¶ 19 Even had CUIC still been a party to this action when the order it is actually trying to appeal  the trial court's oral ruling  was entered, and even if that order had actually affected CUIC's rights, which, as we have noted, it did not, CUIC could only have sought discretionary review of that order. The order was interlocutory in nature and, thus, was not appealable as a matter of right. See RAP 2.2; RAP 2.3. However, in order to have standing to seek review of the trial court's interlocutory order, CUIC must, at a minimum, have had its rights directly affected by that ruling. Had this been the case, it might have sought discretionary review or might have chosen to remain a party to the litigation through the entry of final judgment and appealed from the judgment as a matter of right. But this did not happen.
¶ 20 Because CUIC is not a party aggrieved by the trial court's rulings, it has no standing to appeal. Thus, we dismiss CUIC's appeal.

III

Equitable Contribution

Great American's Liability
¶ 21 The threshold issue in this case is whether Great American's excess policies were triggered, even though United Capitol, the underlying insurer during both of its policy periods, became insolvent and made no payments toward the Polygon settlement. Great American contends that, under the specific language of its policies, its coverage could not be triggered until United Capitol's policies' limits were paid  either by United Capitol, or by Polygon, or by Polygon's other insurers. In other words, according to Great American, someone (anyone other than Great American) had to actually pay the full limits of United Capitol's two underlying policies before any of Great American's excess coverage could be made available to fund the settlement. We disagree.
¶ 22 Great American's argument is premised upon on three specific provisions contained in both of its excess policies. The first is its promise to pay:
A. Insuring Agreement
1. We will pay those sums in excess of "underlying insurance" or the retained limit that the "Insured" becomes legally obligated to pay as damages because of "injury" caused by an "occurrence" to which this policy applies.
CP at 36. The next is a "Limits of Insurance" provision:
SECTION III  LIMITS OF INSURANCE
....
D. In the event of reduction or exhaustion of the aggregate Limits of Insurance of "underlying insurance" by reason of losses paid thereunder, this policy shall....
1. In the event of reduction, continue in force as excess of the reduced "underlying insurance"; or
2. In the event of exhaustion, continue in force as "underlying insurance."
CP at 39-40. Finally, Great American's policies each contain a provision that states:
B. Bankruptcy or Insolvency
....
2. In the event of bankruptcy or insolvency of any underlying insurer, the insurance afforded by this policy shall not replace such "underlying insurance," but shall apply as if the "underlying insurance" was valid and collectible.
CP at 40.
¶ 23 Great American contends that the promise to provide excess coverage never took effect because (1) there were no "losses *787 paid" by United Capitol, nor any "exhaustion" of United Capitol's policy limits, per the limits of insurance provisions, and (2) to find that coverage was triggered would be to force Great American to replace its underlying insurance, in violation of its insolvency provisions. In so contending, Great American relies on Rees v. Viking Insurance Company, 77 Wash.App. 716, 892 P.2d 1128 (1995), which held that "[a]n excess carrier's obligation to pay and defend begins when, and only when, the limits of the primary insurance policy are exhausted." Rees, 77 Wash.App. at 719, 892 P.2d 1128. In essence, Great American asserts that the trial court's conclusion that its policies were triggered forced it to "drop down" to cover United Capitol's two primary policies' payment obligations, in contravention of the explicit language of Great American's policies.
¶ 24 This argument ignores the actual language of the Great American policies. As the trial court correctly observed, "[n]one of the parties contend that Great American is obligated to drop down and provide ... first dollar indemnity of the insolvent United Capitol policies." Memorandum Opinion at 6.[4] Rather, as with any contract analysis, "the starting place ... is interpretation of the words used in the insurance policy itself." Memorandum Opinion at 7 (citing Transcon. Ins. Co. v. Wash. Pub. Utils. Dists. Util. Sys., 111 Wash.2d 452, 456, 760 P.2d 337 (1988)). Here, the promises to pay set forth in Great American's two excess policies provide that if Polygon sustained liability "in excess" of the underlying limits of insurance, Great American's indemnity obligations would be triggered. CP at 43. Only under a strained and implausible reading of the "limits of insurance" provisions do Great American's excess payment obligations simply vanish unless the underlying insurers (or the insured) first actually pay every cent of the policies' limits. To the contrary, the statement that "[i]n the event of reduction" of the underlying insurance, the excess policy "shall... continue in force as excess of the reduced `underlying insurance'" does not have any bearing here. CP at 39. That is, the policy provisions simply mean what they appear to mean  that if the limits of the underlying insurers' policies are reduced by virtue of losses paid, Great American nonetheless continues as the excess insurer above those reduced limits.
¶ 25 Nor does Rees provide support for the position that Great American advocates. In Rees, the actual agreed settlement was not, in fact, in excess of the primary policy limit. Rather, the plaintiffs in that case released the defendants' primary insurer from liability in exchange for a payment in an amount less than its policy limit, but signed an "agreement" that purported to nonetheless authorize the plaintiffs to seek additional funds from the excess insurer. Rees, 77 Wash.App. at 718-19, 892 P.2d 1128. That is to say, the supposed total settlement value stated in the "agreement" was "little more than an artifice designed to support [plaintiffs'] claim against" the excess insurer. Rees, 77 Wash. App. at 718-19, 892 P.2d 1128. That is very different from the situation in this case, where the settlement at issue is substantially greater than the limits of United Capitol's primary policies, either separately or combined. Accordingly, Rees is inapplicable to this case and does not mandate reversal of the trial court's sound conclusion that the actual language of Great American's policies provides that Great American's obligation to pay was triggered when Polygon, as the insured, incurred liability in excess of the limits of United Capitol's underlying policies.[5]
¶ 26 The insolvency provisions in Great American's policies do nothing to change this. Nothing in those provisions purports to relieve Great American of liability if its underlying insurers become insolvent. Rather, the provisions merely stand for the unremarkable proposition that Great *788 American has agreed to pay only those portions of the insured's loss in excess of the underlying insurers' policy limits, regardless of whether the underlying insurers themselves can pay those limits. The mere triggering of Great American's policies (irrespective of the actual amount of Great American's liability) does not force Great American to "drop down" to cover United Capitol's insolvency. The argument that it does  that excess coverage cannot be triggered until every penny of the excess insurers' underlying policy limits are actually paid, either by the listed underlying insurer or by the insured  misunderstands the nature of the payment obligation at issue here. Under Washington law, in continuous damage situations, like this one, each insurer is jointly and severally responsible for the liability covered by the policy. Gruol Constr. Co. v. Ins. Co. of N. Am., 11 Wash.App. 632, 637-38, 524 P.2d 427 (1974).
¶ 27 The trial court correctly concluded from this established rule that, for liability over the limits of those underlying policies, the excess insurers in turn each became liable for the entirety of any excess amount, consistent with the terms of their policies. Nothing in Great American's policies stated that Great American's liability was contingent on the actual payment of the limits of its underlying insurance. To the contrary, its policies clearly state that it will be liable for those sums "in excess" of its underlying insurers' policy limits. Thus, we affirm the trial court's conclusion that Great American contracted to contribute to the Polygon settlement.

Allocation of the Settlement Obligations
¶ 28 Great American next contends that, even if its policies were triggered, it should receive a $2 million credit against its payments toward the settlement amount because United Capitol did not pay its policy limits. According to Great American, if it is not given this credit, the insolvency provisions of its policies will not be given effect and it will not get the benefit of its bargain with Polygon. That is, it contends that "the trial court's ruling nullified key policy language." Great American's contention, then, is that we must reverse the trial court's discretionary equitable allocation of the obligations imposed on the insurers by the settlement because, as a matter of law, that award failed to give proper effect to the terms of Great American's insurance contracts.[6] This argument is the legal equivalent of turning over a rock  we are forced to examine what lies beneath.
¶ 29 We begin by observing that the trial court, in its generally excellent Memorandum Opinion resolving the parties' cross-motions for summary judgment, accepted the parties' incorrect characterization of its inquiry. Namely, the trial court believed that it must "[d]etermine who should be responsible for the $2,000,000 gap caused by the insolvency of United Capitol ... and how that absence of coverage should be allocated among the parties." Memorandum Opinion at 8-9. In other words, the trial court began with the premise that its task was to equitably allocate to some or all of Polygon's remaining solvent insurers $2 million in liability that none of them had specifically contracted to cover. However, that premise is erroneous for two reasons: (1) because Washington law does not impose liability on insurers for losses that they have not contracted to insure and, (2) because Great American actually had terms in its policies addressing the possibility of United Capitol's insolvency and, thus, had contracted with Polygon as to how liability should be allocated should that eventuality arise.
*789 ¶ 30 Washington law does not, in fact, force insurers to pay for losses that they have not contracted to insure. Rather, the contours of an insurer's coverage obligations are defined by the specific language of the insurance contract interacting with the type of loss suffered by the insured. The trial court's erroneous conclusion to the contrary arises from its misapplication of the Supreme Court's opinion in American National Fire Insurance Co. v. B & L Trucking & Construction Co., 134 Wash.2d 413, 951 P.2d 250 (1998).
¶ 31 In B & L, the Supreme Court examined claims by a landowner against an insurer seeking payment of pollution cleanup costs. As in this case, the damage caused to the landowner was of a continuing nature. The landowner was found to be uninsured for a portion of the time during which the pollution causing the damage occurred. At issue in the case was whether, under the specific language of the insurer's policy, it should be held liable for the entire remaining cleanup cost, or whether it should be held liable only for that percentage of the cost that was incurred during the period that it insured, with the remaining liability allocated to the landowner. B & L, 134 Wash.2d at 419-21, 951 P.2d 250. The Supreme Court held that where insurers contract to pay "all sums" arising out of damages incurred by the insured, "Gruol stands for the proposition that all insurers on the risk during the time of ongoing damage have a joint and several obligation to provide full coverage for all damages." B & L, 134 Wash.2d at 424, 951 P.2d 250 (citing Gruol, 11 Wash.App. at 637-38, 524 P.2d 427). Based on this, the court concluded that "the policy language requires insurer to pay all sums for which the insured becomes legally obligated, up to the policy limits. Once coverage is triggered in one or more policy periods, those policies provide full coverage for all continuing damage, without any allocation between insurer and insured." B & L, 134 Wash.2d at 429, 951 P.2d 250 (footnote omitted) (citing Aerojet-Gen. Corp. v. Transport Indem. Co., 17 Cal.4th 38, 55-57, 70 Cal.Rptr.2d 118, 948 P.2d 909 (1997)). The court explicitly stated that its holding was based on the specific language of the insurer's policy and that, had the insurer intended to contract for a pro rata allocation with the insured, "it could have included that language in its policy." B & L, 134 Wash.2d at 427, 951 P.2d 250. B & L expressly does not stand for the proposition that an insurer may be held liable for damages that it has not contracted to insure.
¶ 32 We thus draw two conclusions from B & L. First, that where several insurance policies covering several different periods are triggered by a claim involving continuous harm to the insured, each insurer is generally jointly and severally liable for all covered damages up to the amount of its policy limits without allocation to the insured. Second, a jointly and severally liable insurer may control the allocation of liability, including allocation of liability to the insured, by writing into its policy provisions specifically aimed at doing so.
¶ 33 Here, the trial court misread B & L to stand for the proposition that a loss may be allocated to an insurer in an equitable contribution action even though the insurer's policy does not make it liable for that loss in the first instance. This was the first and most fundamental reason for the trial court's incorrect premise that its task was to allocate among the excess insurers the "gap" in coverage caused by United Capitol's insolvency, which none of them had contracted to insure. The trial court recognized and correctly applied the first principle of B & L by finding all of the excess insurers jointly and severally liable for Polygon's losses in excess of $1 million, the primary insurance limit for each of the respective policy periods. See Memorandum Opinion at 12 ("[a]lthough the B & L case involved allocation of coverage among primary insurers, its principles may apply to the case at hand"). It did not correctly apply the second principle, however, because it crafted its allocation formula without reference to the insolvency clauses in Great American's policies. This, in turn, was the second reason for the trial court's incorrect allocation theory: it ignored that Great American had, in fact, used specific language to address how liability should be allocated in the event that United Capitol became insolvent.
*790 ¶ 34 Great American's insolvency clauses provided that if Great American's underlying insurers  United Capitol, for both of Great American's policy periods  became insolvent, Great American's coverage would not replace the underlying insurers' policy limits but would, instead, apply as if the underlying policies were "valid and collectible." CP at 40. At the same time, Great American's policies each provided that "[t]he insurance afforded by this policy is excess over any other valid and collectible insurance available to the `Insured,' whether or not described in the schedule of underlying policies." CP at 41. Here, the trial court correctly recognized that, because all the excess insurers' policies contained "other insurance" provisions, as to each other those provisions were negated by virtue of being "mutually repugnant." See Pac. Indem. Co. v. Federated Am. Ins. Co., 76 Wash.2d 249, 251-52, 456 P.2d 331 (1969), overruled on other grounds, Mission Ins. Co. v. Allendale Mut. Ins. Co., 95 Wash.2d 464, 626 P.2d 505 (1981). However, the trial court failed to recognize that the "other insurance" provisions were only mutually repugnant to policies containing similar provisions at the same coverage level, because only those policies were "on the same risk." See Memorandum Opinion at 10. Thus, each excess insurer's liability for purposes of contribution was defined both by its "other insurance" clause with respect to all the triggered underlying policies, as well as any other applicable provisions  in Great American's case, its insolvency provisions.
¶ 35 Accordingly, the trial court's task in crafting its contribution award was not to distribute among the various excess insurers the "gap" in coverage created by United Capitol's insolvency but, rather, was to define each insurer's liability for the covered loss according to the terms of its policy or policies. In Assurance's role as excess insurer, that liability was for sums in excess of the valid and collectible underlying policies  Assurance's own $1 million underlying policy, plus CUIC's $1 million underlying policy.[7] Thus, Assurance was jointly and severally liable for sums in excess of $2 million, up to the full settlement amount of $7.8 million. Ohio's liability, stemming from its excess coverage of the second policy period, was identical.
¶ 36 Great American, on the other hand, was jointly and severally liable for sums in excess of Assurance and CUIC's respective $1 million underlying policies, plus  as to each of the discrete policy periods that it insured  United Capitol's $1 million policy limits. This is so because Great American's insolvency provisions required the trial court to treat United Capitol's policies as though they were "valid and collectible" as against Great American, regardless of United Capitol's insolvency. In other words, as to each of its two policy periods, Great American was jointly and severally liable for that portion of the Polygon settlement exceeding the solvent primary insurers' policy limits plus United Capitol's policy's limits, which its insolvency provision required the trial court to treat as though it was valid and collectible. Thus, as to each of the two policy periods Great American insured, it was jointly and severally liable for sums in excess of $3 million, up to the full settlement amount of $7.8 million. The insurers' respective liability is, thus, as follows:[8]

*791
----------------------------------------------------------------------------------------
| | Excess | Excess | Excess | Excess |
| | Insurance | Insurance | Insurance | Insurance |
| | Liability for | Liability for | Liability for | Liability for |
| | 1996-97 | 1997-98 | 1998-99 | 1999-2000 |
|------------|-----------------|------------------|-----------------|-------------------|
| | | | Assurance | Assurance |
| | | | Policy Limits | Policy Limits ($1 |
| | Assurance | Assurance | ($1 million) | million) |
| Underlying | Policy Limits | Policy Limits | + | + |
| Insurers' | ($1 million) | ($1 million) | CUIC Policy | CUIC Policy |
| Policy | + | + | Limits ($1 | Limits ($1 |
| Limits by | CUIC Policy | CUIC Policy | million) | million) |
| Which | Limits ($1 | Limits ($1 | + | + |
| Excess | million) | million) | United Capitol | United Capitol |
| Liability | = | = | Policy Limits | Policy Limits |
| Reduced | $2 million | $2 million | ($1 million) | ($1 million) |
| | | | = | = |
| | | | $3 million | $3 million |
|------------|-----------------|------------------|-----------------|-------------------|
| Total | Liability Above | Liability Above | Liability Above | Liability Above |
| Possible | $2 million up | $2 million up | $3 million up | $3 million up |
| Joint and | to Policy | to Policy | to Policy | to Policy |
| Several | Limits ($10 | Limits ($10 | Limits ($50 | Limits ($50 |
| Liability | million) | million) | million) | million) |
|------------|-----------------|------------------|-----------------|-------------------|
| Total | | | | |
| Actual | Liability Above | Liability Above | Liability Above | Liability Above |
| Joint and | $2 million up | $2 million up | $3 million up | $3 million up |
| Several | to $7.8 million | to $7.8 million | to $7.8 million | to $7.8 million |
| Liability | | | | |
-----------------------------------------------------------------------------------------

¶ 37 The trial court's ruling did not recognize that Great American, as an insurer sued for contribution by another insurer, cannot be held liable for a sum greater than it would have had to pay its insured. See 15 LEE R. RUSS & THOMAS F. SEGALLA, COUCH ON INSURANCE 3D § 217:4, at 217-13 (3d ed.2000) (citing Ore. Farm Bureau Ins. Co. v. Safeco Ins. Co. of Am., 249 Or. 449, 438 P.2d 1018 (1968)). In this regard, the trial court erred. Because Polygon could only recover from Great American for losses in excess of $3 million in either of Great American's two policy periods, Assurance and Ohio, in a subsequent contribution action, may likewise only recover from Great American amounts that take this into account. Stated another way, when the trial court asked rhetorically, "[s]hould Great American be in a better position because its underlying policies became insolvent rather than policies underlying one or both of the other excess carriers?" (Memorandum Opinion at 13), the answer is: yes, because that is what the policies issued by each insurer provide. This result gives effect to the policies of all the excess insurers; nothing in the policies issued by Assurance or Ohio requires that the floor of their liability be raised in the event that another excess insurer's underlying insurer becomes insolvent.
¶ 38 However, Great American's contention that it should only be liable for sums in excess of $4 million (characterized in Great American's briefing as receiving a $2 million "credit"  $1 million for each policy period) misunderstands the nature of its joint and several liability. Great American is jointly and severally liable for sums in excess of $3 million for each of the two policy periods that it insured. Insofar as Great American's insolvency provisions required the trial court to "credit" Great American, it was only to the floor of Great American's joint and several liability in each of its policy periods  i.e., a $1 million "credit." The fact that Great American happens to insure two policy *792 periods does not in any way serve to raise the floor of its joint and several liability for each policy period.
¶ 39 The trial court's contribution award failed to give Great American the benefit of its policies' insolvency provisions. That award thus forced Great American to pay for a loss that it had not contracted to cover. Because the trial court believed that the law allowed this, the trial court based its award on an erroneous legal theory. Consequently, the trial court abused its discretion. Accordingly, we reverse and remand for the trial court to properly exercise its discretion in allocating liability for the Polygon settlement.

Post-Settlement Claims Against Subcontractors
¶ 40 Great American next contends that the trial court erred by setting aside Great American's stipulation with Assurance and Ohio concerning the allocation between them of amounts recovered from third party subcontractors. However, our decision concerning the trial court's contribution award renders this contention moot. The stipulation was based on the trial court's contribution theory, which was premised on an incorrect legal basis and, consequently, constituted an abuse of the trial court's discretion. Thus, on remand, the trial court must revisit the question of how to allocate among the excess insurers amounts recovered as a result of the claims brought by Polygon, with the assistance of Assurance and Ohio, against third parties.
¶ 41 The trial court ruled that "[a]ny such third party recovery should reduce the liability of the excess insurers in an equally apportioned amount among the four policy periods." Memorandum Opinion at 16. An unmistakable premise of this ruling was the trial court's belief that each of the excess insurers had an equitable subrogation interest in these recoveries and that each excess insurer's subrogation interest was equivalent in kind to that of the other excess insurers. However, that is not the case. Accordingly, the trial court must revisit this issue on remand.
¶ 42 To understand the difference between the interests of Assurance and Ohio in the third party recoveries, on the one hand, and the interest of Great American in these recoveries, on the other hand, we must revisit our resolution of the parties' respective liabilities on the loss suffered by Polygon. According to that analysis, had Great American been the only insurer to fund the Polygon settlement, it would have paid on Polygon's behalf $1 million less than the full settlement amount as a result of United Capitol's insolvency. Thus, Great American's policies fail to "make Polygon whole." Indeed, they fall $1 million short of that objective. Because we accept Great American's contention that the terms of its policies do not allow Polygon full recovery of its losses from Great American, we must also examine what effect this circumstance has on Great American's rights to those amounts recovered by Polygon from third parties.
¶ 43 Any right that Great American has to share in the third party recoveries is grounded in principles of equitable subrogation. However, Great American is not equitably subrogated to Polygon's rights to recover from subcontractors until Polygon has first been "made whole." Weyerhaeuser Co. v. Commercial Union Ins. Co., 142 Wash.2d 654, 672, 15 P.3d 115 (2000) ("the insured must first be fully compensated for its loss before any setoff is ever allowed"). As stated in Thiringer v. American Motors Insurance Co., 91 Wash.2d 215, 219, 588 P.2d 191 (1978):
The general rule is that, while an insurer is entitled to be reimbursed to the extent that its insured recovers payment for the same loss from a tort-feasor responsible for the damage, it can recover only the excess which the insured has received from the wrongdoer, remaining after the insured is fully compensated for his loss.
Accord Paulsen v. Dep't of Soc. & Health Serv., 78 Wash.App. 665, 668, 898 P.2d 353 (1995). "[T]he insurer acquires a right to subrogation only after the insured has been fully compensated for the loss." Jones v. Firemen's Relief & Pension Bd. of City of Richland, 48 Wash.App. 262, 267, 738 P.2d 1068 (1987). Accord Elovich v. Nationwide *793 Ins. Co., 104 Wash.2d 543, 555, 707 P.2d 1319 (1985) ("The equitable right of subrogation... arises only after the insured has recovered fully for his injuries."). See also Mahler v. Szucs, 135 Wash.2d 398, 417, 957 P.2d 632 (1998) ("no right of reimbursement existed for the insurer until the insured was fully compensated for a loss," describing Thiringer, 91 Wash.2d at 219-20, 588 P.2d 191).
¶ 44 Here, Assurance and Ohio's policies cover the full amount of liability that Polygon sustained by virtue of its settlement with the Sammamish Pointe homeowners. Both insurers are jointly and severally liable to indemnify Polygon to the full amount of its losses. Thus, Assurance and Ohio are equitably subrogated to Polygon with regard to all recoveries from third parties whose wrongful conduct caused Polygon's losses.
¶ 45 Great American's policies, on the other hand, do not provide Polygon with full coverage for the losses it sustained as a result of the homeowners' claims. Indeed, Great American has strenuously argued this point both in the trial court and before us. Because Great American's policies do not obligate it to pay the first $1 million of Polygon's excess losses, Great American's policies do not make Polygon "whole." Accordingly, Great American is not equitably subrogated to the first $1 million of Polygon's recoveries from the third party subcontractors. Thus, because only Assurance and Ohio are equitably subrogated to the first $1 million of third party recoveries, under a proper understanding of Great American's liability, the trial court, on remand, must take this into account. After the first $1 million of third party recoveries are accounted for, Great American's equitable subrogation interest will become equivalent to that of Assurance and Ohio, and the remainder of the third party recoveries can properly be considered subject to equitable allocation between all three excess insurers.
¶ 46 As between Assurance and Ohio, we express no opinion as to how, on remand, the trial court should allocate this $1 million. "On remand, the trial court retains full authority to exercise its discretion in determining the appropriate remedy" within the bounds of the law. Green v. Normandy Park Riviera Section Cmty. Club, 137 Wash. App. 665, 700, 151 P.3d 1038 (2007).
¶ 47 Similarly, on remand, the trial court is free to allocate the third party subcontractor recoveries in excess of the first $1 million as it deems equitable, with respect to all three excess insurers. The distribution of these proceeds properly falls within the scope of the equitable powers of the trial court, without reference to any prior stipulation by the parties. See Gruol, 11 Wash.App. at 637, 524 P.2d 427 ("the burden of apportionment is on the carriers").

IV

Supplementary Payments Coverage
¶ 48 Assurance contends in its cross-appeal that the trial court erred by ruling that the homeowners' "litigation costs" were "supplementary payments" under Assurance's primary policy and, thus, were solely the responsibility of the primary insurers pursuant to the applicable provisions of their policies.[9] Assurance contends that the one-half[10] of the litigation costs assigned to it as supplementary payments is more properly categorized as being part of Polygon's overall losses and, thus, should be collectible only from its $1 million general liability policy. Moreover, Assurance urges, because the limit of this coverage was fully expended, the $743,000 assigned to it for payment pursuant to the supplementary payments provision of *794 its policy should properly have been covered not by that provision but, rather, by the general excess liability policies of the various excess insurers.
¶ 49 According to Assurance, the supplementary payments provision in its policy, obligating it to pay "[a]ll costs taxed against the insured in the `suit,'" has a specific meaning that does not necessarily include all legal fees or costs incurred by the insured in a lawsuit. Assurance contends that the context of the insurance contract makes clear that "costs taxed" was intended to mean exactly what it means in Washington's statutes and case law. We agree.
¶ 50 The precise policy provision at issue obligates Assurance to make various payments not attributable to its primary coverage limits:
SUPPLEMENTARY PAYMENTS  COVERAGES A AND B
We will pay, with respect to any claim or "suit" we defend:
1. All expenses we incur.
....
5. All costs taxed against the insured in the "suit".
6. Prejudgment interest awarded against the insured....
7. All interest on the full amount of any judgment that accrues....
These payments will not reduce the limits of insurance.
CP at 1263-64.
¶ 51 It is well established under Washington law that, absent another definition provided in the policies themselves, "[t]he language of insurance policies is to be interpreted in accordance with the way it would be understood by the average man, rather than in a technical sense." Dairyland Ins. Co. v. Ward, 83 Wash.2d 353, 358, 517 P.2d 966 (1974). That is, "[u]ndefined terms in an insurance contract must be given their `plain, ordinary, and popular' meaning." Boeing v. Aetna Cas. & Sur. Co., 113 Wash.2d 869, 877, 784 P.2d 507 (1990) (quoting Farmers Ins. Co. v. Miller, 87 Wash.2d 70, 73, 549 P.2d 9 (1976)). In addition, however, we must examine the entire policy as a whole and give effect to every clause contained therein. Tyrrell v. Farmers Ins. Co., 140 Wash.2d 129, 133, 994 P.2d 833 (2000). In determining the meaning of a particular term, we must view the "`contract as a whole, the subject matter and objective of the contract ... and the reasonableness of respective interpretations advocated by the parties.'" Berg v. Hudesman, 115 Wash.2d 657, 667, 801 P.2d 222 (1990) (quoting Stender v. Twin City Foods, Inc., 82 Wash.2d 250, 254, 510 P.2d 221 (1973)). A legal or technical meaning will be applied to a term in an insurance policy if "it is clear that the parties to the contract intended that the language have a [legal or] technical meaning." Thompson v. Ezzell, 61 Wash.2d 685, 688, 379 P.2d 983 (1963).
¶ 52 Such a meaning was intended here. Upon careful examination of the insurance agreement, we conclude from both its text and context that the parties intended the phrase "costs taxed against the insured in a `suit'" to refer to "taxable costs" as that term is commonly used in Washington legal parlance. Assurance and Polygon, as sophisticated business entities, would not have an understanding of a term specifically referring to a legal proceeding that is completely divorced from its standard and well-established legal usage. Further, the items included under the supplementary payments provision of its policy specifically refer to the legal process in one way or another. None arise if the insured is not involved in a lawsuit or other legal proceeding. This being the case, Great American's attempt to read the individual words "costs" and "taxed" in isolation from the surrounding provisions, giving those words the dictionary definitions most favorable to their case, wrongly ignores the text of the supplementary payments provision itself.
¶ 53 Great American and amici respond that Assurance gives inadequate attention to the Supreme Court's holding in Boeing.[11] Great American points to language in Boeing, *795 stating that "before an insurance company can avail itself of a legal technical meaning of a word or words, it must be clear that both parties to the contract intended that the language have a legal technical meaning." Boeing, 113 Wash.2d at 882, 784 P.2d 507. According to Great American, the fact that Polygon included a claim in its original suit against Assurance for the "litigation costs" portion of the settlement is evidence of the fact that only Assurance  if anyone  intended to give "costs taxed" its "legal or technical" meaning.
¶ 54 We find this argument unconvincing. The mere fact that Polygon later included a claim against Assurance in a lawsuit does not establish the intent of the parties at the time of contracting. Instead, the text of the supplementary payments provision in Assurance's primary insurance policy, in combination with the context of that agreement's creation, demonstrate that the parties to that agreement intended that the phrase "costs taxed" should be given the meaning that Washington's courts and legislature have always given it.
¶ 55 Boeing does not mandate a different result. As Assurance points out, Great American greatly de-emphasizes aspects of the actual rule referenced in Boeing  namely, that "the language of insurance policies should be interpreted in accordance with its ordinary meaning rather than in a technical sense, unless it is clear that the parties to the contract intended that the language have a technical meaning." Thompson, 61 Wash.2d at 688, 379 P.2d 983 (emphasis added). See Boeing, 113 Wash.2d at 882, 784 P.2d 507 (citing Thompson).
¶ 56 The agreement at issue in this case, unlike the one at issue in Boeing, shows that both parties intended that the phrase "costs taxed against the insured in the `suit'" be given its legal meaning. In Boeing, the question was whether the word "damages" should be so limited as to exclude any environmental cleanup costs apportioned in an equitable action. The insurer argued that "damages" should be given a limited meaning excluding "response costs" recovered in an equitable action. See Boeing, 113 Wash.2d at 875, 784 P.2d 507. The court found that nothing in the insuring agreement indicated that the parties intended the word "damages" to exclude all recoveries in equity. Boeing, 113 Wash.2d at 876, 784 P.2d 507. Significantly, the court could also find nothing in the context of the policy provisions to indicate that such a meaning was intended. Boeing, 113 Wash.2d at 877, 784 P.2d 507.
¶ 57 The opposite is true here. Every aspect of the location and phrasing of Assurance's supplementary payments provision indicates that its terms specifically refer to taxable costs. Unlike in Boeing, the relevant term is not "sandwiched into the general coverage provisions." Boeing, 113 Wash.2d at 877, 784 P.2d 507. To the contrary, the supplementary payments provision is isolated from Assurance's general promises to pay on behalf of and defend Polygon and is clearly subsidiary to the overarching obligations of the contract. It would be surprising indeed for a sophisticated commercial insurer like Assurance and a sophisticated builder like Polygon to have memorialized a bargain providing blanket coverage for plaintiffs' reasonable attorney fees  routinely collectible under both the Condominium Act and the Consumer Protection Act, the bases for most condominium construction defect claims  with the abbreviated phrase "costs taxed against the insured." Rather, it would be expected that, had Assurance contracted to pay all conceivable awards of attorney fees, it would have clearly said so in the insuring agreement.
¶ 58 "If parties to an insurance contract use words having a specific legal meaning, they will be presumed to have intended that those words be construed in accordance with established rules of law." Bernhard v. Reischman, 33 Wash.App. 569, 577, 658 P.2d 2 (1983). Having concluded that both the text and the context of the insurance agreement provide clear indications that both parties intended the phrase "costs taxed" to have its legal meaning, we further conclude that Washington law is uniform in excluding reasonable attorney fees from that meaning. Our costs statute, RCW 4.84.010, lists the costs that may be taxed in a suit in Washington. It does not include an award of reasonable attorney fees. Moreover, cases from *796 the Supreme Court and from this court uniformly hold that "taxable costs" are not to be defined outside the scope of those which are provided in RCW 4.84.010. See, e.g., Nordstrom, Inc. v. Tampourlos, 107 Wash.2d 735, 743, 733 P.2d 208 (1987) ("Costs have historically been very narrowly defined" to those items enumerated in RCW 4.84.010). Indeed, the legislative history of that statute indicates that reasonable attorney fees were specifically omitted. See SENATE JOURNAL, 48th Leg., Reg. Sess., at 1378 (Wash.1983) (Senator Talmadge: "[T]his is in civil litigation and where an individual prevails in a lawsuit, whether a plaintiff or a defendant, they get their statutory costs. They would not get reasonable attorneys' fees.").
¶ 59 Disregarding this authority, Great American cites various cases from other jurisdictions that have held that the phrase "costs taxed" in provisions similar to the one here at issue can be construed to include reasonable attorney fees. See Mut. of Enumclaw v. Harvey, 115 Idaho 1009, 772 P.2d 216 (1989); Ins. Co. of N. Am. v. Nat'l Am. Ins. Co., 37 Cal.App.4th 195, 43 Cal.Rptr.2d 518 (1995); Liberty Nat'l Ins. Co. v. Eberhart, 398 P.2d 997 (Alaska 1965). However, as Assurance correctly notes, all of those cases are from jurisdictions that specifically provide that reasonable attorney fees are allowed as taxable costs.[12]
¶ 60 Because we reject Great American's argument that the phrase "costs taxed" in Assurance's primary policy included the homeowners' "litigation costs" as set forth in the Polygon settlement, we hold that the trial court erred by apportioning $743,000 of these "litigation costs" to Assurance for payment from its supplementary payments provision. We further hold that because the settlement did not differentiate between the homeowners' attorney fees and other costs, no portion of that sum can now properly be categorized as payable under the supplementary payments provision of Assurance's primary policy. Instead, the entirety of the sum that the trial court assigned to Assurance as a supplementary payment must be considered as a loss in excess of Assurance's primary policy limit and, accordingly, must be paid by and apportioned among Assurance, Ohio, and Great American pursuant to their excess coverage obligations according to the formula of equitable apportionment utilized by the trial court on remand.

V

Prejudgment Interest
¶ 61 Great American and Ohio assign error to the trial court's award of prejudgment interest on the portion of the Polygon settlement obligation that the trial court allocated to them under their excess insurance policies. The basic thrust of their argument is that because equitable allocation of the settlement by the trial court could have been approached in various ways, the ultimate liability was discretionary, unforeseeable, and, thus, unliquidated, precluding the award of prejudgment interest. Review of the trial court's ruling is for abuse of discretion. Scoccolo Constr., Inc. v. City of Renton, 158 Wash.2d 506, 519, 145 P.3d 371 (2006).[13]
*797 ¶ 62 Prejudgment interest is available "(1) when an amount claimed is `liquidated' or (2) when the amount of an `unliquidated' claim is for an amount due upon a specific contract for the payment of money and the amount due is determinable by computation with reference to a fixed standard ... without reliance on opinion or discretion." Prier v. Refrigeration Eng'g Co., 74 Wash.2d 25, 32, 442 P.2d 621 (1968). A settlement made in an underlying lawsuit is generally liquidated with respect to subsequent indemnity claims. King County v. Puget Sound Power & Light Co., 70 Wash. App. 58, 62, 852 P.2d 313 (1993). At issue here is whether the subsequent need to equitably apportion such a settlement obligation necessarily converts it into an unliquidated sum such that a trial court abuses its discretion by awarding prejudgment interest on its award.
¶ 63 The parties offer differing authority in answer to this question. Great American and Ohio, on the one hand, point to Car Wash Enterprises, Inc. v. Kampanos, 74 Wash.App. 537, 874 P.2d 868 (1994). Assurance, on the other hand, cites to Egerer v. CSR West, LLC, 116 Wash.App. 645, 67 P.3d 1128 (2003)  the case relied upon by the trial court  to support its position.
¶ 64 According to Great American and Ohio, Car Wash is most analogous to this case because it also involved equitable reallocation. In Car Wash, the prior owners of property that had been contaminated by a service station were sued by their successor for contribution to the cost of cleaning up the parcel. Car Wash, 74 Wash.App. at 540, 874 P.2d 868. The amount of recovery available was determined by the trial court "`based on such equitable factors as the court determines are appropriate.'" Car Wash, 74 Wash.App. at 542, 874 P.2d 868 (quoting RCW 70.105D.080). Basing its contribution calculation on how long the defendants had operated the service station, the trial court allocated seven-elevenths of the cleanup cost to them, but denied the plaintiff an award of prejudgment interest. Car Wash, 74 Wash. App. at 540-41, 874 P.2d 868. We affirmed the denial of prejudgment interest, holding that, although the cleanup costs were in a sum certain, the defendant's share of them "was necessarily a product of the trial court's discretion" and damages were, accordingly, unliquidated. Car Wash, 74 Wash.App. at 548-49, 874 P.2d 868.
¶ 65 In Egerer, by contrast, the defendant breached a contract to supply fill to a developer-plaintiff. Relying on Washington's Uniform Commercial Code, the trial court awarded the plaintiff the cost of "cover"  that is, the fair market value of replacement fill. Egerer, 116 Wash.App. at 648-50, 67 P.3d 1128. It also awarded prejudgment interest on the amount. We affirmed the award of prejudgment interest, holding that, the remedy being set by statute, the trial court "exercised discretion only to find the appropriate market price." Egerer, 116 Wash.App. at 654, 67 P.3d 1128. Thus, while the defendant could not predict "precisely how much it would owe ... until judgment was rendered," the award was "within a range of market values [that were] readily ascertainable." Egerer, 116 Wash.App. at 655, 67 P.3d 1128.
¶ 66 Egerer is the more applicable authority. The fact that Car Wash was a case in equity is not decisive; allocating contribution amounts to an insurance settlement does not involve the type of discretion that apportionment of an environmental cleanup obligation does. The actual extent of the defendant's liability in Car Wash could not be determined until trial. In contrast, the sum at issue here was fixed by the terms of the Polygon settlement. As illustrated by our discussion in part III, above, the scope of the trial court's discretion was bounded by the law as to apportionment between the insurers. "The fact that a claim is disputed does not render the claim unliquidated, so long as it may be determined by reference to an objective source." Egerer, 116 Wash.App. at 653, 67 P.3d 1128. Indeed, "a liquidated claim remains so even if the defendant is partially successful in reducing his or her share of liability." Hadley v. Maxwell, 120 Wash.App. 137, 144, 84 P.3d 286 (2004). "In other words, the defendant's claim that he or she is not liable for part or all of the plaintiff's liquidated damages will not preclude a successful plaintiff from receiving prejudgment *798 interest." Hadley, 120 Wash.App. at 143, 84 P.3d 286.
¶ 67 That the parties put forward a motley of variously plausible theories as to how the Polygon settlement should be allocated does not make their obligations discretionary with the trial court and thus "de-liquidate" that settlement. We decline to adopt Great American and Ohio's theory, under which prejudgment interest could never be awarded in equitable actions. So holding would be at odds with the fundamentally equitable principle underlying the very availability of prejudgment interest.
¶ 68 That principle is that "`he who retains money which he ought to pay to another should be charged interest upon it.'" Prier, 74 Wash.2d at 34, 442 P.2d 621 (quoting 5 A. CORBIN, Contracts, § 1046 n. 69 (1964)). The successful claimant is compensated for the lost "use value" of the money owed. Hansen v. Rothaus, 107 Wash.2d 468, 473, 730 P.2d 662 (1986). That is, an award of prejudgment interest is in the nature of preventing the unjust enrichment of the defendant who has wrongfully delayed payment. See 1 DAN B. DOBBS, LAW OF REMEDIES § 3.6(3), at 348-49 (2d ed.1993) ("in many cases the interest award is necessary to avoid unjust enrichment of a defendant who has had the use of money or things which rightly belong to the plaintiff"). If anything, the application of this principle is particularly well-suited to cases brought in equity insofar as it deters further wrongful delay of payment by the defendant. See DOBBS, supra, at 350 ("if the defendant is literally making money by nonpayment, he may have incentive to delay"). It is the accepted rule that, "[w]hen a court appropriately applies the doctrine of unjust enrichment, the unjustly enriched party is generally liable for interest on the benefits received." Martinez v. Cont'l Enters., 730 P.2d 308, 317 (Colo.1986) (citing DOBBS, supra, § 3.5). The equitable principles underlying an unjust enrichment claim and a claim for equitable contribution are strikingly similar.
¶ 69 Here, both Great American and Ohio withheld substantial payment owed to Assurance, gambling that doing so would eventually be to their economic benefit. As the trial court observed, they "could have hedged their bets in a fashion which could have preempted or reduced exposure of prejudgment interest." Verbatim Report of Proceedings (Nov. 21, 2003) at 17. That they failed to do so is an insufficient basis for finding that the trial court abused its discretion when it awarded prejudgment interest. The trial court correctly concluded that it could award prejudgment interest in this action, and we affirm its decision to do so.
¶ 70 However, because the award of prejudgment interest was based on the liability that the trial court calculated as a result of its erroneous equitable contribution ruling, we must reverse the amount of prejudgment interest awarded. On remand, the trial court should calculate the prejudgment interest to be assessed against Great American and Ohio based on the amount of the settlement liability that it decides to equitably allocate to those insurers under the legal principles articulated elsewhere in this opinion.

VI

Attorney Fees
¶ 71 Finally, Assurance contends that the trial court erred by limiting the award of attorney fees made to it pursuant to Olympic Steamship Co. v. Centennial Insurance Co., 117 Wash.2d 37, 811 P.2d 673 (1991), to those fees incurred in relation to establishing Great American's liability. According to Assurance, the trial court misapplied the law when it determined that "Assurance should not recover fees and costs relating to briefing and argument of the prejudgment interest," contribution theory, supplementary payments, and attorney fee issues. CP at 1747. We conclude that the trial court did err when it awarded attorney fees, but not for the reason that Assurance contends. Rather, the trial court erred by awarding any attorney fees related to the equitable contribution action. And, as previously discussed, all of Assurance's claims in this action (other than those related to recoveries *799 from third parties)[14] are equitable contribution claims, not claims based on any assignment of rights by Polygon. We may not reverse the trial court's erroneous attorney fee award to Assurance, however, because Great American has not assigned error to or otherwise appealed from this order of the trial court.
¶ 72 In Washington, a court has no power to award attorney fees as a cost of litigation in the absence of an applicable provision of a contract, statute, or a recognized ground in equity providing for fee recovery. Dayton v. Farmers Ins. Group, 124 Wash.2d 277, 280, 876 P.2d 896 (1994). Olympic Steamship provides such an equitable ground: that an insured successfully suing an insurer to obtain coverage may also recover reasonable attorney fees necessarily incurred in the endeavor. See McRory v. N. Ins. Co. of New York, 138 Wash.2d 550, 554-55, 980 P.2d 736 (1999) (quoting Olympic Steamship, 117 Wash.2d at 52-53, 811 P.2d 673). There is no question that, under Olympic Steamship, "assignees of the insured may recover fees if they are compelled to sue an insurer to secure coverage." McRory, 138 Wash.2d at 556, 980 P.2d 736 (citing Estate of Jordan v. Hartford Accident & Indem. Co., 120 Wash.2d 490, 507-08, 844 P.2d 403 (1993)).
¶ 73 But Assurance's claims against Great American and Ohio were not based on Polygon's assignment of rights. Instead, Assurance's claims were claims for equitable contribution against jointly liable co-insurers  claims that arise from the rights of the overpaying insurer, not from the rights of the insured. The "right of equitable contribution belongs to each insurer individually. It is not based on any right of subrogation to the rights of the insured, and is not equivalent to standing in the shoes of the insured." Fireman's Fund Ins. Co. v. Md. Cas. Co., 65 Cal.App.4th 1279, 1294, 77 Cal.Rptr.2d 296 (Cal.App.1998) (internal quotation marks omitted). The equitable basis established in Olympic Steamship for attorney fee awards is limited to efforts necessary to establish coverage for claims against the insured and is based on the rights of the insured. Polygon's only right was to full recovery; thus, in this equitable contribution action, Assurance was not asserting Polygon's rights. It was asserting its own rights. The rule of Olympic Steamship has never been extended to include equitable contribution claims between insurers. No such extension is warranted.
¶ 74 Similarly, Assurance's related assertion that it should be granted fees for work done in attempting to deny Polygon coverage under its primary policy's supplementary payments provision stands Olympic Steamship completely on its head and would not warrant serious discussion, even had the trial court's attorney fee award been proper.
¶ 75 Ohio and Assurance also request Olympic Steamship fees for defending Great American's appeal. Because the trial court's original award of attorney fees was erroneous, there is no basis for an award of fees on appeal.
¶ 76 Finally, we must make clear that, although the trial court erroneously awarded Assurance attorney fees and we are not willing to exacerbate that error either by reversing the trial court's limitation of the fee award or by awarding additional attorney fees on appeal, there is no basis for us to reverse the award that the trial court did make. Great American has neither assigned error to the award made nor argued in its brief that the award was erroneous. We will not reverse the trial court on an issue that has not been appealed or argued. See RAP 2.4(a); Cowiche Canyon Conservancy v. Bosley, 118 Wash.2d 801, 809, 828 P.2d 549 (1992).
¶ 77 Affirmed in part, reversed in part, and remanded.
WE CONCUR: BAKER, J.P.T., and COX, J.
NOTES
[1] Our record explains the involvement of Valley and Truck as follows: "Valley and Truck were `additional insured' carriers of Polygon that insured one or more subcontractors, whose policies allegedly provided some coverage to Polygon as an additional insured. They are not parties to this action." Clerk's Papers (CP) at 973.
[2] The settlement agreement stated that Polygon would pursue the subcontractors and would receive 15 percent of gross recoveries as uninsured damages, that the insurers would pay the costs associated with pursuing the subcontractors, and that any remaining recoveries would be allocated among the insurers.
[3] The commissioner's July 31, 2006 notation ruling stated: "Based on the materials before me, it appears that [CUIC] is an aggrieved party and is therefore entitled to seek review by the appellate court. See RAP 3.1. But ultimately the decision regarding the proper role, if any, of [CUIC] is more properly decided by the panel that considers the appeal on the merits."
[4] For purposes of this opinion, we cite to the trial court's Memorandum Opinion on the parties' cross-motions for summary judgment, Clerk's Papers 1114-1131, as "Memorandum Opinion."
[5] Great American's reliance on our decision in Federal Insurance Company v. Pacific Sheet Metal, Inc., 54 Wash.App. 514, 774 P.2d 538 (1989), is similarly misplaced. The settlement at issue in that case was not, in fact, in excess of the limits of the underlying policy. See Fed. Ins. Co., 54 Wash.App. at 515, 774 P.2d 538.
[6] Assurance and Ohio contend that the issue of the trial court's allocation is not properly before us because "Great American did not assign error to the trial court's allocation method." This argument is specious. Great American's first assignment of error and its briefing make clear that it has appealed both the trial court's conclusion that its policy was triggered and the trial court's allocation to it of 50 percent of the excess liability. Even supposing that inclusion of the phrase "trial court's allocation method" was actually required in Great American's assignments of error, our review of the allocation would be appropriate. A minor technical violation of RAP 10.3(g) will not bar appellate review where the nature of the challenge is perfectly clear and the challenged ruling is set forth and fully discussed in the appellate brief. Goehle v. Fred Hutchinson Cancer Research Ctr., 100 Wash.App. 609, 614, 1 P.3d 579 (2000).
[7] Each of the excess insurers had an "other insurance" provision in its policy substantially similar to this provision contained in Great American's policy:

F. Other Insurance
The insurance afforded by this policy is excess over any other valid and collectible insurance available to the "Insured," whether or not described in the schedule of underlying policies (except insurance purchased specifically to apply to excess of the Limits of Insurance of this policy).
CP at 41.
[8] The chart below serves to illustrate the excess insurers' liability with respect to one another. We recognize that $160,000 in payments was made toward the settlement by insurers of companies other than Polygon. While these payments do not serve to redefine the parties' respective liability, they may be fairly considered by the trial court on remand with regard to equitable reallocation of the settlement obligations.
[9] The parties did not differentiate which portion of the settlement's "litigation costs" constituted the plaintiffs' attorney fees and which constituted costs incurred by filing, service, and the like. Moreover, the settlement did not indicate under what legal authority the homeowners were recovering attorney fees in the first place  e.g., the Condominium Act (ch. 64.34 RCW), the Consumer Protection Act (ch. 19.86 RCW), or upon some other basis.
[10] Early in the litigation, CUIC agreed to pay the other half of the "litigation costs" portion of the Polygon settlement pursuant to its substantially identical supplementary payments provision, thus prompting its attempt to "tag along" on Assurance's cross-appeal of this issue.
[11] Great American is joined in opposing Assurance's cross-appeal on this issue by Amici "Builders," a group of property developers. The Builders, like Great American, assert that "Boeing is absolutely dispositive of this issue."
[12] Great American also cites to a federal district court case, St. Paul Fire & Marine Ins. Co. v. Hebert Constr., Inc., 450 F.Supp.2d 1214 (W.D.Wash.2006). We are not persuaded by the reasoning of this decision, however, because the result reached therein was based on the erroneous conclusion that Mutual of Enumclaw v. Harvey was "directly on point." St. Paul, 450 F.Supp.2d at 1233. As previously indicated, Harvey's outcome was based upon a policy construction specific to Idaho law and, thus, is inapplicable here.
[13] The parties disagree on the standard of review of the trial court's award of prejudgment interest. Citing Scoccolo, Assurance states that a "trial court's award of prejudgment interest is reviewed for abuse of discretion." In contrast, Great American cites McConnell v. Mothers Work, Inc., 131 Wash.App. 525, 536, 128 P.3d 128 (2006), for the proposition that "whether damages are liquidated for purposes of prejudgment interest is reviewed de novo." Both cases in turn cite Kiewit-Grice v. State, 77 Wash.App. 867, 895 P.2d 6 (1995), for their differing standards. The source of confusion is not readily apparent; all three cases involve the question of whether damages are liquidated, and Kiewit-Grice clearly states that the appellate courts "review a trial court's award of prejudgment interest for abuse of discretion." Kiewit-Grice, 77 Wash.App. at 872, 895 P.2d 6. This correct statement of the law was adopted by the Supreme Court in Scoccolo, whose pronouncement is of course final, in any event.
[14] Fees incurred as a result of cooperating with Polygon's prosecution of claims against subcontractors, and litigating the allocation of these proceeds as against Great American's claims to them, do not qualify for a fee award pursuant to Olympic Steamship, in that they were not fees incurred by an insured in an effort necessary to establish coverage.